Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

PIPELINERS LOCAL UNION NO. 798, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, CLC, Defendant.

No. 79–C–406–BT.

United States District Court, N. D. Oklahoma.

April 29, 1980.

Hubert H. Bryant, U. S. Atty., George Carrasquillo, Asst. U. S. Atty., Tulsa, Okl., Jordana Wilson, Douglas N. White, Office of the Regional Solicitor, Dept. of Labor, Dallas, Tex., for plaintiffs.

William K. Powers, Tom L. Armstrong, Dyer, Powers, Marsh, Turner & Armstrong, Tulsa, Okl., for defendants.

## MEMORANDUM OPINION

BRETT, District Judge.

*INTRODUCTION:*

The Secretary of Labor seeks an order declaring the February 1979 election of officers of the defendant local union null and void and further requests that a new election under the supervision of the Department of Labor be ordered. The following alleged violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959, § 401(c) (29 U.S.C. 481(c)) by the Union serve as the basis for the plaintiff's action: (1) failing to timely distribute challenger's campaign literature, (2) discrimination in the availability of membership list, and/or (3) unequal treatment of candidates in the use of Union facilities. After a thorough review of the evidence, the Court concludes a new election should be ordered because of the defendant's violations of § 401(c) of the Act (29 U.S.C. 481(c)).

In December 1978 the defendant, Pipeliners Local Union No. 798, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO, CLC ("Union") completed its tri-annual election of officers in which the membership totaling approximately 2,650 journeymen and welders were permitted to vote. A Union helper successfully protested the election contending it was invalid because the approximately 2,650 helpers were denied the right to cast votes. The national president on December 29, 1978 directed the Union to immediately conduct new nominations and a new election of officers, permitting qualified helpers the right to vote.

An annual meeting had already been scheduled for January 12, 1979 so it was decided to also use this date to conduct nominations and form an election committee. Slates were nominated on January 12, 1979, headed by incumbents Throneberry-Hendrix and challengers Morris-Sportsman to fill the posts of Business Manager, Financial Secretary and other offices.

The election committee set January 19, 1979 to mail out the ballots and a month later on February 20, 1979 to count the ballots. The incumbents got busy and had their campaign literature prepared three or four days before ballot mailing day of January 19, 1979. On the evening of January 16, 1979 two Union office employees volunteered to work overtime and use the Union addressograph to address envelopes. The incumbent Union Financial Secretary, Doyle Hendrix, then took the envelopes to his home on February 17, 1979, and his

family and friends in the neighborhood assisted in stuffing, sealing, and stamping them. Incumbent campaign literature was then mailed to the 5,306 Union members, including helpers, on January 18, 1979, the day before the mailing of the ballots. On January 15, 1979, the challenger slate representative advised the Union it intended to use Union facilities in accordance with § 401(c) of the Act (29 U.S.C. 481(c)), to mail out its campaign literature.[1] The Union responded by saying any such reasonable request would be honored during normal work hours, Monday through Friday. On January 16 or 17, 1979, Sportsman, of the challenger slate, advised the Union Business Manager the challengers wanted to use the Union facilities for mailing their campaign literature on January 19 or 20, 1979. Clifton Throneberry, incumbent Business Manager, stated both days were unacceptable and not a reasonable request because on the 19th the office would be preoccupied with the ballot mailing and the 20th was a Saturday, when only a skeleton force worked half day. The Business Manager said the earliest convenient day for the Union office to assist in the challenger campaign literature mailing because of the press of ongoing Union business was Wednesday, January 24, 1979. Challengers were refused requests to advance the date by employees working overtime, outside help being employed, or the membership list being allowed off the premises.

The challengers had two pieces of campaign literature with printed matter about the challenger slate. The first was not delivered by the Denver, Colorado printer until January 18, and the second, containing photographs of the challenger slate, the printer was not able to deliver until January 23, 1979. Since the Union facilities were not made available on January 19 or 20 as requested, the challengers used a personal and unofficial list of journeymen and welders to mail campaign literature to approximately 2,000 members on January 20 and 21st. None of the new approximately 2,650 helper voters were included in this mailing. Then on January 24 and 25 Union facilities were made available and the second piece of challenger literature was mailed on the afternoon of January 25, 1979.

Ballot receipt information indicates approximately 50% to 60% of those voting had already cast a ballot by the time any of the challengers' literature had reached the new helper voters. On February 20, 1979 a total of 3,858 valid ballots were counted with the incumbents prevailing. In the two principal offices the vote count was as follows:

Business Manager [2]

| Clifton Throneberry, Jr. | 2,491 |
| J. W. Morris | 1,233 |
| Joe E. Wyatt | 135 |

Financial Secretary

| Doyle Hendrix | 2,792 |
| Larry A. Sportsman | 1,055 |

The other candidates on the ballot had similar incumbent over challenger majorities. To change the Business Manager result, 630 of incumbent Throneberry's votes would have had to vote for challenger Morris. For a like change in the Financial Secretary result, 869 votes for incumbent Hendrix would have to be cast for challenger Sportsman.

The election committee selected on January 12, 1979, set January 19, 1979, one week later for the mailing of the ballots. This as a practical matter allowed one week for the candidates to conduct a national campaign. The Court views this as too little time for the conduct of a national campaign and the crux of the timing problem here presented. One week was allotted for campaigning and one month for casting ballots. This Union membership is both transient and mobile so consideration should be given to sufficient time for campaign literature to reach the

---

1. This Act requires incumbent union officers and its employees to accommodate challengers in mailing campaign literature. Human nature being what it is may result in an inefficient response and a noticeable want of alacrity.

2. The total Business Manager vote exceeds the 3,858 total valid ballots count by one; simply an interesting though irrelevant discrepancy.

members. This issue is not before the Court but it is difficult to ignore the underlying incipient cause. At the Union's regular tri-annual elections approximately six weeks of campaign time is scheduled from nominations to balloting. This is more in keeping with the election regulations of 29 C.F.R. 452.65 [3], 452.66 [4], and 452.79 [5].

## FINDINGS OF FACT

This cause came on for trial before the Court, sitting without a jury, on March 25, 1980. Having heard and considered the pleadings, all relevant evidence, statements of counsel, and being fully advised in the premises, in accordance with Rule 52(a), F.R.Civ.P., the Court makes and issues its Findings of Fact as follows:

1. The defendant is, and at all times relevant to this action has been, an unincorporated association and a local labor organization engaged in an industry affecting commerce, maintaining its principal office at 4823 South 83rd East Avenue, Tulsa, Oklahoma.

2. Defendant is, and at all times relevant to this action has been, chartered by and subordinate to the United Association of Journeymen and Apprentices of the Plumbing and Pipe-fitting Industry, hereinafter referred to as the National, a national labor organization.

3. Defendant, acting in accordance with the national constitution and by-laws and its own constitution and by-laws, conducted an election of officers by mail ballot during the period from January 19, 1979 to February 20, 1979. This was a new election required by the National Union when approximately 2,650 helpers were not permitted to vote in the regular tri-annual election, held the previous month, December 1978.

4. Candidates for the Union election were nominated at a nomination meeting held on January 12, 1979. The various offices to be filled for a three-year period were: Business Manager, Financial Secretary, President, Vice-President, Recording Secretary, Inside Guard, Executive Board (4), and Finance Board (3).

5. As of December 31, 1978 there were 5,306 members of the defendant Union eligible to vote in the election; approximately one-half of the membership were journeymen and welders and the remaining one-half helper members.

6. The Union's jurisdiction extends throughout the country in pipelining installations and the membership is spread throughout a wide geographical area of the United States.

7. Due to the wide geographical distribution of the Union membership, it was

---

3. § 452.65 Interval between nominations and election.
"The Act specifies no time interval between nominations and election. Thus, both may be scheduled to be held at the same meeting if, during a reasonable period prior to such nomination-election meeting, every member eligible to hold office who intends to run for office is afforded the protection provided in section 401(c), including sufficient opportunity to campaign for office."

4. § 452.66 Statutory provisions.
"The opportunity for members to have a free, fair and informed expression of their choices among candidates seeking union office is a prime objective of Title IV of the Act. Voters can best be assured opportunity for an informed choice if certain campaign rights are guaranteed to candidates and their supporters. To this end, the statute provides that adequate safeguards to insure a fair election shall be provided, and states certain specific safeguards. These safeguards apply not only to candidates for officer positions as defined in

the Act but also to candidates for delegate posts, if the delegates are to nominate or elect officers."

5. § 452.79 Opportunity to campaign.
"There must be a reasonable period prior to the election during which office-seekers and their supporters may engage in the campaigning that the Act contemplates and guarantees. What is a reasonable period of time would depend upon the circumstances, including the method of nomination and the size of the union holding the election, both in terms of the number of members and the geographic area in which it operates. For example, a candidate for office in a local labor organization was improperly disqualified and then appealed to the international union which directed that his name be placed on the ballot. A complaint was considered properly filed alleging election violations because the candidate's name was restored to the ballot two days prior to the election so that he was denied an equal opportunity to campaign. * * *"

necessary to conduct elections by use of mail ballots and to distribute campaign literature by use of the mail.

8. On January 19, 1979, 5,306 ballots were mailed to members (journeymen, welders, and helpers) who were eligible to vote in the election; 3,858 ballots were returned and included in the count as valid on February 20, 1979.

9. The incumbent slate prevailed and the margin of victory in the election varied according to the various offices; however, the Business Manager vote was Throneberry 2,491 to Morris' 1,233, and the Financial Secretary vote was Hendrix 2,792 to Sportsman's 1,055. Therefore, a swing of 630 and 869 votes, respectively, would be required to change the voting result.

10. Challenger Sportsman was also an unsuccessful candidate for Business Manager against Throneberry in the regular tri-annual election in December 1978, losing by a margin of 1,549 to 545.

11. Clifton Throneberry is the Business Manager of the defendant Union and has served in that position since 1973; Doyle Hendrix is the Financial Secretary of the defendant Union and has served in that position since 1972.

12. The Throneberry-Hendrix slate used Union office staff working overtime on January 16, 1979 for the addressing of campaign literature. Hendrix took the 5,306 addressed envelopes to his home where his family and neighborhood friends assisted in stuffing, sealing, and stamping for the January 18, 1979 mailing.

13. On January 15, 1979, Sportsman on behalf of the challenger slate notified the Union by mailgram of his intention to use Union facilities for the distribution of campaign literature; no specific date was requested at that time.

14. The Union, acting through incumbent Business Manager Throneberry, informed Sportsman that Union facilities would be available for the challengers' use during normal business hours, Monday through Friday, upon reasonable notice. Since the mailing of ballots was to occur on January 19, 1979, this became a critical date by which time campaign literature should be sent to the membership to be informative.

15. Sportsman, on January 16 or 17, orally requested Union facilities and staff be made available for mailing the challengers' campaign literature on either Friday, January 19 or Saturday, January 20. The Union stated January 19 was preoccupied with mailing of the ballots and Saturday, January 20 was not a normal work day; the earliest stated convenient day for Union facilities to be available was Wednesday, January 24, 1979, because of the press of ongoing Union business.

16. Over the period of time from January 18 through January 25, 1979, a serious ice storm hampered both business mobility and efficiency in Tulsa, Oklahoma.

17. The challengers' campaign literature consisted of two documents, one of which was ready for mailing on January 19, 1979, and the other was ready for mailing on January 23, 1979. When the Union refused mailing assistance until January 24, Sportsman used a personal unofficial membership list of journeymen and welders only to mail the first piece of campaign literature to about 2,000 persons on January 20 and 21 from his home in Colorado Springs, Colorado.

18. The Union then provided the office staff and facilities for mailing of the challengers' second piece of campaign literature on January 24 and 25, 1979, the latter date being the date of mailing. By the time the challengers slate campaign literature was received by the general membership of 5,306 on about January 28, 1979, approximately one-half of those voting (1,692) had already cast their ballots.

19. Sportsman, on behalf of the challenger slate, on several occasions before January 25, 1979, offered to pay for overtime or parttime help to aid in the preparation and distribution of campaign literature. Sportsman also offered to take the preaddressed envelopes away from the Union office to speed up the campaign literature

mailing process. The defendant Union made no attempt to arrange overtime or parttime employment to aid in the distribution of Sportsman's literature; and the Union specifically denied Sportsman's request to remove the addressed envelopes from the Union premises asserting the membership list should not be permitted to leave the premises. (This was a privilege extended the incumbents who took the pre-addressed envelopes to Hendrix' home; being justified purportedly because as a Union trustee Hendrix was a custodian of the membership list.)

20. The earlier prepared challenger campaign literature could have been mailed by January 19, 1979, or January 20, 1979, if the Union had made available overtime, parttime, or outside help. Since January 19, 1979 was ballot mailing day and January 20 was a Saturday, it is understandable, though not reasonable, why the Union would urge these days were unsuitable. Even if that argument were acceptable, in no event beyond Monday, January 22 could the Union's refusal to provide Union facilities for the challengers' campaign literature mailing be justified. The Union's position that the challengers' request was not reasonable lacks support due to the exigencies of the particular election. Usually a few days' delay in mailing campaign literature would not be material, but here with the January 19, 1979 ballot mailing date, the delay became material. The response of the Union in providing assistance relative to the later challenger campaign literature mailing on January 24 and 25 was reasonable in view of the fact it was not ready from the printer in Denver, Colorado until January 23, 1979.

21. Defendant's contention that plaintiff's second piece of campaign literature was the principal piece to be distributed to the union membership does not alter the Union's obligation to respond to the plaintiff's reasonable request to mail the plaintiff's first piece of campaign literature.

22. The cost of distribution of campaign literature was borne by the candidates in the case of both the incumbents and the challenger; there was no request that the Union bear the cost of distribution of literature, including the cost of either additional or outside help.

23. No evidence was introduced bearing on the effect timely receipt of challenger campaign literature might have had on the election results. Union testimony in this regard dealt with blind probabilities as in the "flip of a coin". Though odds are substantially against a change in the election results, Congress' expressed intent of fair elections and the integrity of the election process must be the paramount consideration.

24. The challengers, Morris and Sportsman, properly protested the election through both the local organization and the National Union. All protests were denied, and the challenging candidates exhausted all administrative remedies available to them.

25. The Secretary of Labor properly conducted an investigation of the protest and found probable cause to believe that a violation of § 401(c) of the Act had occurred and had not been remedied. Thereafter, plaintiff properly brought this action before the Court.

26. With the exception of the campaign literature mailing violations set out herein, the election process was otherwise in keeping with the statutory provisions. A local independent certified public accounting firm supervised the balloting process and counting.

## CONCLUSIONS OF LAW

1. Any of the foregoing Findings of Fact which properly might be characterized Conclusions of Law are hereby made Conclusions of Law.

2. The Court has jurisdiction of this action and of the defendant, pursuant to § 402(b) of the Act (29 U.S.C. 482(b)).

3. The defendant's election, conducted between January 19, 1979 and February 20, 1979, was subject to the provisions of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. 401 *et seq.*).

4. The defendant was under a statutory obligation (29 U.S.C. 481(c)) to provide adequate safeguards to insure that its January-February 1979 election was fairly conducted.[6]

5. The defendant Union was under a duty to comply with all reasonable requests of any candidate to distribute by mail or otherwise, at the candidate's expense, campaign literature in aid of such person's candidacy (29 U.S.C. 481(c)). *Wirtz v. American Guild of Variety Artists*, 267 F.Supp. 527 (S.D.N.Y.1967); *Marshall v. Plumbers and Steamfitters Local 654*, 85 CCH Lab. Cases ¶ 11032 (N.D. Texas 1978).

6. The request of candidate Larry A. Sportsman, and representative of the challenger slate, for mailing of campaign literature on January 19, or January 20, 1979, was a reasonable request within the meaning of § 401(c) of the Act (29 U.S.C. 481(c)), in view of the exigency caused by the ballot mailing date of January 19, 1979.[7]

7. The defendant's failure to comply with the candidate's request for mailing of campaign literature on January 19 or 20, 1979, constituted a violation of the provisions of § 401(c) of the Act (29 U.S.C. 481(c)). Additionally, the defendant's delays in providing Union facilities for the mailing of the candidate's first piece of campaign literature until January 24 and 25, 1979 constituted a constructive denial of a candidate's reasonable request for the distribution of campaign literature.

8. When overtime staff was utilized for the incumbent's mailing but denied to the challenging candidates, the defendant did not provide equal treatment concerning the use of Union facilities in the distribution of campaign literature (29 U.S.C. 481(c)), 29 C.F.R. 452.66 (footnote 4), 452.67 (footnote 8) and 452.79 (footnote 5). When the incumbent candidates were allowed to have access to the Union membership list off the Union office premises, while denying a similar right to the challenging candidates, the defendant discriminated in favor of the incumbent and against the challenging slate in the use of the Union membership list in violation of 29 U.S.C. 481(c), 29 C.F.R. 452.67[8], and 29 C.F.R. 452.-71[9].

---

6. ". . . every local labor organization, and its officers, shall be under a duty, . . . to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. . . ."

7. § 452.79  Opportunity to campaign.

" * * * Similarly, in a mail ballot election a union's delay in the distribution of campaign literature until after the ballots have been distributed and some have been cast would not satisfy the requirement to distribute such literature in compliance with a reasonable request. Such a delay would deny the candidates a reasonable opportunity to campaign prior to the election and would thus not meet the requirement for adequate safeguards to insure a fair election. * * * "

8. § 452.67  Distribution of campaign literature.

"The Act imposes the duty on the union and its officers to comply with all reasonable requests of any candidate to distribute his campaign literature to the membership at his expense. When the organization or its officers authorize distribution of campaign literature on behalf of any candidate, similar distribution under the same conditions must be made for any other candidate, if he requests it. In order to avoid charges of disparity of treatment among candidates, it is advised that a union inform all candidates in advance of the conditions under which distribution will be made and promptly advise them of any change in those conditions."

9. § 452.71  Inspection of membership lists.

*    *    *    *    *    *

"(b) It is the duty of the labor organization and its officers to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members. Thus, if a union permits any candidate to use such lists in any way other than the right of inspection granted by the Act, it must inform all candidates of the availability of the list for that purpose and

The defendant was under an obligation to provide overtime employees, employ additional temporary staff, or obtain outside mailing assistance, at the expense of the candidate making the request, for the distribution of the challenging candidate's literature. By failing to do so the defendant failed to comply with the candidate's reasonable request for distribution of literature. 29 U.S.C. 481(c); 29 C.F.R. 452.69 [10], *Marshall v. Laborers Local 478*, 461 F.Supp. 185 (U.S.D.Fla.1978).

9. By establishing that defendant violated § 401(c) of the Act, (29 U.S.C. 481(c)), plaintiff has established a prima facie case that the violations may have affected the outcome of the election. *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); *Wirtz v. Local 410*, 366 F.2d 438 (C.A.2d 1966); *Hodgson v. Local 1280, Carpenters*, 78 LRRM 2820 (ND Cal. 1971).

 10. The defendant failed to meet its burden of proving that the violations of § 401(c) of the Act did not affect the outcome of the election; therefore, the defendant has failed to rebut the prima facie case presented by the plaintiff.

11. Because of the violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. 401 *et seq.*) the plaintiff is entitled to judgment declaring defendant's January-February 1979 election to be null and void. The plaintiff is also entitled to a judgment directing the defendant to conduct a new election within ninety (90) days of the date of the judgment herein under the supervision and direction of the plaintiff, and the costs of this action. The defendant shall distribute to each of its members in good

standing either by mail or in its newsletter within thirty (30) days of the entry of this judgment a complete copy of the Court's Memorandum Opinion, Findings of Fact and Conclusions of Law, entered April 28, 1980 and Judgment, without editorial comment, and said defendant shall so certify to this Court within forty-five (45) days of the entry of this judgment. The Court will retain jurisdiction of this action until such time as the new election is conducted and the results are certified to the Court by the plaintiff, at which time final judgment will be entered disposing of this matter.

---

accord the same privilege to all candidates who request it. Such privileges may include permitting inspection of the list where members are not subject to a collective bargaining agreement requiring membership as a condition of employment, inspecting the list more than once, or copying the list."

**10.** § 452.69 Expenses of campaign literature. "\* \* \* In view of the fact that expenses of distribution are to be borne by the candidate a labor organization may not refuse to distribute

campaign literature merely because it may have a small staff which cannot handle such distribution for all candidates. If this is the case, the organization may employ additional temporary staff or contract the job to a professional mailer and charge the expense incurred to the candidates for whom the service is being rendered. The organization may require candidates to tender in advance the estimated costs of distributing their literature, if such requirement is applied uniformly."