WIRTZ, SECRETARY OF LABOR *v.* HOTEL,
MOTEL & CLUB EMPLOYEES UNION,
LOCAL 6.

No. 891.   Argued April 29, 1968.—Decided June 3, 1968.

*Harris Weinstein* argued the cause for petitioner. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Weisl, Louis F. Claiborne, Alan S. Rosenthal, Robert V. Zener, Charles Donahue, George T. Avery,* and *Beate Bloch.*

*Sidney E. Cohn* argued the cause for respondent. With him on the briefs was *Jerome B. Lurie.*

*Laurence Gold* argued the cause for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging affirmance. With him on the brief were *J. Albert Woll* and *Thomas E. Harris.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This action was brought by petitioner, the Secretary of Labor, in the District Court for the Southern District of New York for a judgment declaring void the May 1965 election of officers conducted by respondent Local 6, and ordering a new election under the Secretary's supervision. The action is authorized by § 402 (b) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 534, 29 U. S. C. § 482 (b). The Secretary charged that a bylaw of the Local which limited eligibility for major elective offices to union members who

494

hold or have previously held elective office [1] was not a "reasonable qualification" within the intendment of the provision of § 401 (e) of the Act, 29 U. S. C. § 481 (e), that "every member in good standing shall be eligible to be a candidate and to hold office (subject to . . . reasonable qualifications uniformly imposed) . . . ." [2] He charged further that enforcement of the bylaw "may have affected the outcome" of the election within the meaning of § 402 (c), 29 U. S. C. § 482 (c).[3]

[1] The bylaw provided:

"In order to be eligible for nomination as an officer, a candidate must possess the following qualifications: (1) He must be a member of the Union in continuous good standing for a period of two years immediately preceding his nomination; (2) He must be a member of either the Assembly or the Executive Board, or else, at some time in the past, have served at least one term on either the Executive Board, the Assembly, or the old Shop Delegates Council. In order to be eligible for nomination as a member of the Executive Board, as a delegate to the Assembly, or as a department delegate, a candidate must be a member of the Union in continuous good standing for a period of at least one year immediately preceding his nomination."

[2] Section 401 (e) provides in pertinent part:

"In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. . . ." 29 U. S. C. § 481 (e).

[3] Section 402 (c) provides:

"If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

.      .      .      .      .

"(2) that the violation of section 481 of this title may have affected the outcome of an election, the court shall declare the election, if any, to be void and direct the conduct of a new election

The District Court, after hearing, entered a judgment which declared that the prior-office requirement was not reasonable, but also declared that it could not be found that its enforcement in violation of § 401 (e) "may have affected the outcome" of the election. The court therefore refused to set aside the May 1965 election and to order a new election under the Secretary's supervision, but did grant an injunction against enforcement of the bylaw in future elections. 265 F. Supp. 510. The Court of Appeals for the Second Circuit reversed the provision of the judgment which declared the bylaw not to be reasonable and its enforcement violative of § 401 (e), and set aside the injunction.[4] The court found it unnecessary in that circumstance to decide whether enforcement of the bylaw at the election may have affected the outcome. 381 F. 2d 500. We granted certiorari. 390 U. S. 919. We hold that the restriction was not reasonable and that its enforcement may have affected the outcome of the election. The Secretary is therefore entitled to an order directing a new election under his supervision.

---

under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization. . . ." 29 U. S. C. § 482 (c).

[4] Judge Dimock dissented from the reversal of the declaratory judgment but concurred in the setting aside of the injunction. However, he did not join the majority in holding that the District Court was without power to enjoin future violations; his concurrence was "based upon the Secretary's concession of lack of power in the district court." 381 F. 2d, at 507. This issue is not before us.

The District Court did not consider other violations alleged in the complaint because no member of Local 6 had first invoked union remedies to redress them pursuant to § 402 (a). In light of our decision we need not consider the Secretary's argument that a member's protest triggers a § 402 enforcement action in which the Secretary may challenge any violation of § 401 discovered in his investigation of the member's complaint and brought to the attention of the union. Cf. *Wirtz* v. *Local 125, Laborers' Int'l Union,* 389 U. S. 477, 481–482.

## I.

Title IV is one of the seven titles of the Labor-Management Reporting and Disclosure Act (LMRDA). Earlier this Term, we observed that "Title IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic' elections. The legislative history shows that Congress weighed how best to legislate against revealed abuses in union elections without departing needlessly from its long-standing policy against unnecessary governmental intrusion into internal union affairs." *Wirtz* v. *Local 153, Glass Bottle Blowers Assn.,* 389 U. S. 463, 470–471. The Court of Appeals, however, in considering the reasonableness of the bylaw, emphasized only the congressional concern not to intervene unnecessarily in internal union affairs, stating that "[i]n deciding the issue of reasonableness we must keep in mind the fact that the Act did not purport to take away from labor unions the governance of their own internal affairs and hand that governance over either to the courts or to the Secretary of Labor. The Act strictly limits official interference in the internal affairs of unions." 381 F. 2d, at 504. But this emphasis overlooks the fact that the congressional concern to avoid unnecessary intervention was balanced against the policy expressed in the Act to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles. As we said in *Wirtz* v. *Bottle Blowers, supra,* at 473, decided after the Court of Appeals decided this case, ". . . Congress, although committed to minimal intervention, was obviously equally committed to making that intervention, once warranted, effective in carrying out the basic aim of Title IV." Thus, "the freedom allowed unions to run their own elections was reserved for those elections which conform to the democratic prin-

ciples written into § 401." *Id.*, at 471. In a companion case, *Wirtz* v. *Local 125, Laborers' Int'l Union,* 389 U. S. 477, 483, we said that the provisions of § 401 are "necessary protections of the public interest as well as of the rights and interests of union members." In sum, in § 401 ". . . Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." *Wirtz* v. *Bottle Blowers, supra,* at 475.

A pervasive theme in the congressional debates about the election provisions was that revelations of corruption, dictatorial practices and racketeering in some unions investigated by Congress [5] indicated a need to protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership. This theme is made explicit in the reports of the Labor Committees of both Houses of Congress.[6] It is

---

[5] See Report of the Senate Committee on Improper Activities in the Labor or Management Field, S. Rep. No. 1417, 85th Cong., 2d Sess. (1958). See discussion in *Wirtz* v. *Bottle Blowers, supra,* at 469–470.

[6] ". . . Like other American institutions some unions have become large and impersonal; they have acquired bureaucratic tendencies and characteristics; their members like other Americans have sometimes become apathetic in the exercise of their personal responsibility for the conduct of union affairs. . . .

". . . [E]ffective measures to stamp out crime and corruption and guarantee internal union democracy, cannot be applied to all unions without the coercive powers of government . . . .

". . . Union members have a vital interest . . . in the policies and conduct of union affairs. To the extent that union procedures are democratic they permit the individual to share in the formulation of union policy. This is not to say that in order to have democratically responsive unions, it is necessary to have each union

reflected in the discrete provisions of Title IV and also of Title I, the "Bill of Rights" for union members. 29 U. S. C. § 411. Title IV, and particularly § 401, was the vehicle by which Congress expressed its policy. That section prescribes standards to govern the conduct of union elections: International union elections must be held at least once every five years and local elections at least once every three years. Elections must be by secret ballot. Specific provisions insure equality of treatment in the mailing of campaign literature; require adequate safeguards to insure a fair election; guarantee a "reasonable opportunity" for the nomination of candidates, the right to vote, and the right of every member in good standing to be a candidate subject to "reasonable qualifications uniformly imposed," the guarantee with which we are concerned in this case. 29 U. S. C. §§ 481 (a)–(e). Furthermore, although Congress emphatically gave unions the primary responsibility for enforcing compliance with the Act, Congress also settled enforcement authority on the Secretary of Labor to insure that serious violations would not go unremedied and the public interest

member make decisions on detail as in a New England town meeting. What is required is the opportunity to influence policy and leadership by free and periodic elections.

. . . . .

"It needs no argument to demonstrate the importance of free and democratic union elections. . . . The Government which gives unions . . . power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom they represent. The best assurance which can be given is a legal guaranty of free and periodic elections. The responsiveness of union officers to the will of the members depends upon the frequency of elections, and an honest count of the ballots. Guaranties of fairness will preserve the confidence of the public and the members in the integrity of union elections." S. Rep. No. 187, 86th Cong., 1st Sess., 6–7, 20 (1959); I Leg. Hist. 402–403, 416. And see H. R. Rep. No. 741, 86th Cong., 1st Sess., 6–7, 15–16 (1959); I Leg. Hist. 764–765, 773–774.

go unvindicated. See *Wirtz* v. *Bottle Blowers, supra;* *Wirtz* v. *Laborers' Union, supra; Calhoon* v. *Harvey,* 379 U. S. 134.[7]

Congress plainly did not intend that the authorization in § 401 (e) of "reasonable qualifications uniformly imposed" should be given a broad reach. The contrary is implicit in the legislative history of the section and in its wording that "every member in good standing shall be eligible to be a candidate and to hold office . . . ." This conclusion is buttressed by other provisions of the Act which stress freedom of members to nominate candidates for office.[8] Unduly restrictive candidacy qualifications can result in the abuses of entrenched leadership that the LMRDA was expressly enacted to curb. The check of democratic elections as a preventive measure is seriously impaired by candidacy qualifications which substantially deplete the ranks of those who might run in opposition to incumbents.

It follows therefore that whether the Local 6 bylaw is a "reasonable qualification" within the meaning of § 401 (e) must be measured in terms of its consistency with the Act's command to unions to conduct "free and democratic" union elections.

---

[7] See, *e. g.,* S. Rep. No. 187, *supra,* n. 6, at 34; H. R. Rep. No. 741, *supra,* n. 6, at 26–27; I Leg. Hist. 430, 784–785.

For the general background and legislative history of the Act, see generally Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 851 (1960); Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819 (1960); Levitan & Loewenberg, The Politics and Provisions of the Landrum-Griffin Act, in Regulating Union Government 28 (M. Estey, P. Taft, & M. Wagner eds. 1964); Rezler, Union Elections: The Background of Title IV of LMRDA, in Symposium on LMRDA 475 (R. Slovenko ed. 1961).

[8] See 29 U. S. C. § 481 (e): "a reasonable opportunity shall be given for the nomination of candidates . . ."; *id.,* § 411 (a) (1): "Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates . . . ."

## II.

Local 6 has 27,000 members, assets of $2,300,000, and assets in welfare, pension, and medical funds of some $30,000,000. The Local represents bartenders, maids, dining room employees, and kitchen employees of hotels, motels, and private clubs in New York. It is structured into six geographic districts, each with five craft departments, for hotel and motel employees, and a seventh district for private clubs. The various crafts have their own representatives in each hotel, motel, or club. An Assembly, composed in 1965 of 372 members, meets four times a year and is the basic representative body. The delegates are elected from among the craft units within each of the seven districts on the basis of one delegate for each 75 members of a craft. The Assembly in turn elects from its membership an Executive Board on the basis of one board member for each 500 members, augmented by principal officers and by nonvoting business agents, 31 of whom are elected from the seven districts and others who are appointed by the Assembly. The Executive Board meets monthly. There is also an Administrative Board made up of, in addition to general officers, seven district vice-presidents elected from the districts and elected or appointed delegates to the New York Hotel and Motel Trades Council. Finally there are four paid full-time general officers—President, Secretary-Treasurer, General Organizer, and Recording Secretary, all elected by the membership at large. Terms of office are three years. In practice the affairs of the Local are administered by the general officers and the Administrative Board.

The bylaw under challenge [9] limited eligibility for positions as a general officer, district vice-president or elected

---

[9] The Local has amended its bylaw to liberalize the candidacy requirements (making eligible department delegates and members of

business agent to members of either the Assembly or the Executive Board or members who, "at some time in the past, have served at least one term on either the Executive Board, the Assembly, or the old Shop Delegates Council." The Shop Delegates Council was abolished in 1951 and replaced by the Assembly. These qualifications apply, however, only to members who stand for election for office. Vacancies may not always be filled by election; the general officers may in such cases fill vacancies by appointment of members without prior office-holding experience, with the approval of the Executive Board and the Assembly.

By the terms of the bylaw, in the May 1965 election only 1,725 of the 27,000 members were eligible to run for office. Of these, 1,182, or 70%, were eligible only because of service on the Shop Delegates Council which had been abolished 14 years earlier. Thus, only 543 of the eligibles, some 2% of the membership, had at some time or other served at least a term in the Assembly, designated in the bylaws as "the highest body of the Union," since its creation in 1951.

Five elections were held between 1951 and 1965. All of them were won by the "Administration Party," whose slates were composed largely of incumbents. Until the May 1965 election there was only token opposition to those slates. Early in 1965, however, a "Membership Party" was organized. It attempted to field a slate of candidates to oppose the "Administration Party" slate for, among others, the four general offices and for 13 of the 27 vice-president and business agent posts. But

five years' good standing) and the amended bylaw was to govern an election scheduled for May 16, 1968. The District Court held the amended bylaw also unreasonable, but that ruling is not before us. 265 F. Supp., at 522–523. In any event, respondent's argument that the amendment renders this case moot is foreclosed by *Wirtz* v. *Bottle Blowers, supra,* at 475–476. See also *Wirtz* v. *Laborers' Union, supra,* at 479.

enforcement of the bylaw disqualified the "Membership Party" candidates for the general office of Secretary-Treasurer and for eight of the district offices.[10]   Other "Membership Party" nominees were disqualified for lack of good standing.   In result, the "Membership Party" slate was reduced to candidates for the offices of president, general organizer, and business agent in two districts.   The "Administration Party" ran a full slate and elected its candidates by margins up to 7 to 1. Following the election, "Membership Party" members protested the validity of the bylaw and, after unsuccessfully exhausting internal union remedies as required by § 402 (a)(1), filed the complaint with the Secretary of Labor as authorized by that section which in due course led to the Secretary's filing this action.

Plainly, given the objective of Title IV, a candidacy limitation which renders 93% of union members ineligible for office can hardly be a "reasonable qualification." The practical effect of the limitation was described by the District Court:

> "In practice it was not possible to be elected to the Assembly except with the blessing of the Administration Party conferred by selection to run for the Assembly on Row A [of a voting machine]. This was doubtless in large part because there was never a full slate of opposing candidates for the Assembly.   The candidates to run on Row A for the Assembly were selected by the incumbent group of officers and were put in nomination after caucuses of invited members, attended by officers.   It was only natural that candidates selected to run on Row A for the Assembly would be supporters of the

---

[10] For example, the "Membership Party" nominee for one of the vice presidencies was a department delegate (or shop steward) who had been active in his district council meetings; but he was ruled ineligible since he had not held office in the Assembly.

administration. All candidates on Row A were pledged to support each other. Dissidents could not be elected to the Assembly. . . .

. . . . .

"Since 1951 the only way new members could become eligible for office was to win election to the Assembly. But in this period the only candidates which won such election were those who ran on Row A, the administration ticket. The only way to run on Row A was to be selected by the administration. Thus, dissidents could not become eligible to be opposing candidates for office and effective opposition was thus sharply curtailed." 265 F. Supp., at 516, 520.

The Local attempts to defend the restriction as a "reasonable qualification" by citing the concededly impressive record of the "Administration Party" in running the Local's affairs since 1951. There is no reason to doubt that the Local has enjoyed enlightened and aggressive leadership. But that fact does not sustain the Local's burden. Congress designed Title IV to curb the possibility of abuse by benevolent as well as malevolent entrenched leaderships.

The Local also argues that the high annual turnover in membership, the diverse interests of the various craft units and the multimillion-dollar finances of the Local justify the bylaw as a measure to limit the holding of important union offices to those members who have acquired a familiarity with the Local's problems by service in lesser offices. That argument was persuasive with the Court of Appeals, which said:

"[I]t is not self-evident that basic minimum principles of union democracy require that every union entrust the administration of its affairs to untrained and inexperienced rank and file members. . . . It does not seem to us to be surprising

that the union should hesitate to permit a cook or a waiter or a dishwasher without any training or experience in the management of union affairs to take on responsibility for the complex and difficult problems of administration of this union.

.  .  .  .  .

"We do not believe that it is unreasonable for a union to condition candidacy for offices of greater responsibility upon a year [*sic*] of the kind of experience and training that a union member will acquire in a position such as that of membership in Local 6's Assembly." 381 F. 2d, at 505.

That argument is not, however, persuasive to us. It assumes that rank-and-file union members are unable to distinguish qualified from unqualified candidates for particular offices without a demonstration of a candidate's performance in other offices. But Congress' model of democratic elections was political elections in this country, and they are not based on any such assumption. Rather, in those elections the assumption is that voters will exercise common sense and judgment in casting their ballots. Local 6 made no showing that citizens assumed to make discriminating judgments in public elections cannot be relied on to make such judgments when voting as union members. Indeed the Local is not faithful to its own premise. A member need not have prior service in union office to be *appointed* to a vacancy in any office. Also, many members of the powerful Administrative Board become such by reason of their *appointments* as delegates to the New York Hotel and Motel Trades Council, another example of important officers who are not required to have had prior service. Moreover, as the District Court found, "once such an officer is appointed, he automatically becomes a member of the Assembly and immediately becomes eligible to run thereafter for any union office. This enables the incumbent

group to qualify members for elective office by a procedure not available to dissidents." 265 F. Supp., at 520.

The bylaw is virtually unique in trade union practice. It has its counterpart in some other locals of this International Union but not in all; and it is not a requirement included in the International's constitution. Among other large unions only the International Ladies Garment Workers Union has a similar restriction, but that union provides members with the alternative of a union-conducted course in union management. Of 66 unions reporting receipts over $1,000,000 for 1964, only locals of ILGWU and Local 6 reported having this requirement.

Control by incumbents through devices which operate in the manner of this bylaw is precisely what Congress legislated against in the LMRDA. Cf. *Wirtz* v. *Bottle Blowers, supra,* at 474–475. Accordingly, we hold that the bylaw is not a "reasonable qualification" within the meaning of § 401 (e).

### III.

The Secretary was not entitled to an order for a supervised election unless the enforcement of the bylaw "may have affected" the outcome of the May 1965 election, § 402 (c), 29 U. S. C. § 482 (c). The "may have affected" language appeared in the bill passed by the Senate, S. 1555.[11] The bill passed by the House, H. R. 8342,

---

[11] Senator Kennedy had introduced, and the Senate had passed, similar legislation in the 85th Congress which died in the House. Senator Kennedy's bill, S. 3751, included the "may have affected" language. In introducing the measure, he noted that "[i]f the United States District Court agrees with the Secretary, that there has been a *substantial* violation of the provisions of the bill, then he shall void the election . . . ." 104 Cong. Rec. 7954. (Emphasis supplied.) The Senate-passed version, S. 3974, retained the language and the report on the bill said this:

"Since an election is not to be set aside for technical violations but only if there is reason to believe that the violation has *probably* affected the outcome of the election, the Secretary would not file

and the Kennedy-Ervin bill introduced in the Senate, S. 505, required the more stringent showing that the violation actually "affected" the outcome. The difference was resolved in conference by the adoption of the "may have affected" language.[12] Senator Goldwater explained,

> "The Kennedy-Ervin bill (S. 505), as introduced, authorized the court to declare an election void only if the violation of section 401 actually affected the outcome of the election rather than may have affected such outcome. The difficulty of proving such an actuality would be so great as to render the professed remedy practically worthless. Minority members in committee secured an amendment correcting this glaring defect and the amendment is contained in the conference report." 105 Cong. Rec. 19765.

The provision that the finding should be made "upon a preponderance of the evidence" was left undisturbed when the change was made. That provision is readily satisfied, however, as is the congressional purpose in changing "affected" to "may have affected" in order to avoid rendering the proposed "remedy practically worthless," by ascribing to a proved violation of § 401 the effect

---

a complaint unless there were also probable cause to believe that this condition was satisfied. . . . After a hearing on the merits the court would determine whether a violation had occurred which might have affected the outcome of an election." S. Rep. No. 1684, 85th Cong., 2d Sess., 13 (1958). (Emphasis supplied.) Why Senator Kennedy modified the language in S. 505 is not explained.

[12] The Conference Report noted the change as follows:

"In subsection (c) of section 402, the conference substitute adopts the provision of the Senate bill that directs the court to set aside an election if the violation 'may have' affected the outcome. Under the House amendment an election could be set aside only if the violation did affect the outcome." H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 35 (1959); I Leg. Hist. 939.

of establishing a prima facie case that the violation "may have affected" the outcome. This effect may of course be met by evidence which supports a finding that the violation did not affect the result. This construction is peculiarly appropriate when the violation of § 401, as here, takes the form of a substantial exclusion of candidates from the ballot. In such case we adopt the reasoning of the Court of Appeals for the Second Circuit in *Wirtz* v. *Local Union 410, IUOE,* 366 F. 2d 438, 443:

> "The proviso was intended to free unions from the disruptive effect of a voided election unless there is a meaningful relation between a violation of the Act and results of a particular election. For example, if the Secretary's investigation revealed that 20 percent of the votes in an election had been tampered with, but that all officers had won by an 8–1 margin, the proviso should prevent upsetting the election. . . . But in the cases at bar, the alleged violations caused the exclusion of willing candidates from the ballots. In such circumstances, there can be no tangible evidence available of the effect of this exclusion on the election; whether the outcome would have been different depends upon whether the suppressed candidates were potent vote-getters, whether more union members would have voted had candidates not been suppressed, and so forth. Since any proof relating to effect on outcome must necessarily be speculative, we do not think Congress meant to place as stringent a burden on the Secretary as the district courts imposed here."

The District Court acknowledged that the issue was "governed by the teaching of Wirtz v. Local Unions 410, etc." and correctly held that under its principle "a violation by disqualification of candidates does not automatically require a finding that the outcome may have

been affected." 265 F. Supp., at 520–521. We cannot make out from the court's opinion, however, whether the violation was regarded as establishing a prima facie case that the outcome was affected. But if we assume that the court accorded the violation that effect, we disagree with its conclusion that the evidence met that case. The court cited the substantial defeat of those "Membership Party" candidates who did run, the lack of evidence that any of the disqualified nominees was a proven vote-getter, the lack of a substantial grievance or issue asserted by the "Membership Party" against the incumbents, and the overwhelming advantage enjoyed by the "Administration Party" of having a full slate of candidates. 265 F. Supp., at 521. We do not think that these considerations constitute proof supporting the court's conclusion. None of the factors relied on is tangible evidence against the reasonable possibility that the wholesale exclusion of members did affect the outcome. Nothing in them necessarily contradicts the logical inference that some or all of the disqualified candidates might have been elected had they been permitted to run. The defeat suffered by the few candidates allowed to run proves nothing about the performance that might have been made by those who did not. The District Court properly perceived that the bylaw necessarily inhibited the membership generally from considering making the race, but held that any inference from this was disproved by "the heavy vote in favor of the administration candidates . . . ." *Ibid.* But since 93% of the membership was ineligible under the invalid bylaw, it is impossible to know that the election would not have attracted many more candidates but for the bylaw. In short, the considerations relied on by the court are pure conjecture, not evidence. We therefore conclude that the prima facie case established by the

violation was not met by evidence which supports the District Court's finding that the violation did not affect the result.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court with direction to order a new election under the Secretary's supervision.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.