Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

LOCAL 1010, UNITED STEELWORKERS OF AMERICA, AFL–CIO, CLC, Defendants.

Civ. No. H 77–64.

United States District Court, N. D. Indiana, Hammond Division.

Aug. 6, 1980.

Andrew B. Baker, Jr., Asst. U. S. Atty., Hammond, Ind., Herman Grant, Regional Sol., U. S. Dept. of Labor, Chicago, Ill., Beate Bloch, Associate Sol., U. S. Dept. of Labor, Washington, D. C., for plaintiff.

Joseph A. Yablonski and Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D. C., Arthur A. Daronatsy, Gary, Ind., Judith R. Schneider, New York City, Joseph L. Rauh, Jr. and John Silard, Rauh, Silard & Lichtman, Washington, D. C., for defendants.

## MEMORANDUM DECISION

McNAGNY, District Judge.

Invoking § 402(b) of Title IV of the Labor–Management Reporting and Disclosure Act of 1959, 73 Stat. 534, 29 U.S.C. § 482(b), the Secretary of Labor ("the Secretary") brought this action asking the Court to set aside an election held by Local 1010, United Steelworkers of America, AFL–CIO ("the Union") and to mandate that a new election be held. The Secretary alleges that the April 8, 1976 election of the officers of defendant local was not held in a manner consistent with the procedural prescriptions of § 401 of the Act, 29 U.S.C. § 481. In three particulars the Secretary charges that the election was conducted in violation of the statute: 1) votes were not cast by secret ballot, 2) a number of unused ballots were burned shortly after the election, and

3) adequate safeguards to insure a fair election as identified in 29 U.S.C. § 481(c) were not provided. The defendant agrees with the Secretary that the April 8, 1976 election was conducted in a manner inconsistent with the dictates of § 401 but for reasons described herein argues that the election should not be set aside.

Each party has moved for summary judgment. Before ruling on the motions, the history of the election and ensuing events can be stated briefly.

### I. Findings of Fact

In 1970, James Balanoff ran for the Presidency of the Union and lost. In 1973, Balanoff ran for the Presidency against Henry "Babe" Lopez and again lost. The 1973 contest was relatively close. Balanoff was the leader and candidate of the Rank–and–File Caucus, a political organization of union members. The Rank–and–File Caucus had been in existence since 1958 and was quite active. Regular meetings of the membership of the Caucus were held, a Caucus newspaper was published, and candidates for union positions were slated and supported. Members of the Rank–and–File were often critical of leaders of the International.

Lopez was Financial Secretary of the Union from 1962 to 1973. In 1973, he headed the Combined Caucus and was elected as its candidate to the Presidency of the Union. The Combined Caucus was a collection of union members who had previously belonged to older caucuses. Among the organizations with which many Combined Caucus members had been earlier aligned were the Steelworkers for Progress, the Concerned Steelworkers, the Solidarity Slate, and the Unity Slate. The Combined Caucus and its predecessor organizations had often supported positions taken by the officers and district directors of the International, the United Steelworkers of America.

The hostility between the Rank–and–File Caucus and the Combined Caucus was exacerbated by the rise of Edward Sadlowski to leadership in District 31, the district in

which defendant is located. In February, 1973, Sadlowski, with the support of Balanoff and the Rank–and–File Caucus ran for the position of District Director of District 31. Lopez and the Combined Caucus backed Samuel Evett. Evett won the 1973 election. The election was found to have been conducted in violation of § 401, however, and when the Secretary supervised a rerun election in 1974, Sadlowski won handily. In the rerun election, Balanoff and the Rank–and–File Caucus remained firm in their support of Sadlowski while Lopez with the Combined Caucus continued to support Evett.

In April, 1976, many of the incumbent Local 1010 officers were members of the Combined Caucus. In the April, 1976 election for Local 1010 officers, the Rank–and–File Caucus challenged the leadership of Lopez and those other incumbent office–holders who were members of the Combined Caucus. Each of the two caucuses ran a full slate of candidates. Sadlowski, then District Director for District 31 supported the Rank–and–File slate. A number of important employees of the International, including I. W. Abel, then President of the International, backed the slate of candidates put forward by the Combined Caucus.

A committee was chosen to supervise the election. While consisting of 87 members, those committee members loyal to the Rank–and–File Caucus numbered only about seven. The vast majority of the Election Committee supported Lopez and the Combined Caucus. From the Election Committee, a chairman, a vice–chairman, and a secretary were chosen. Martin Connelly was chosen to be Chairman of the Election Committee. At the time he was selected as Chairman, Connelly was the editor of the Union's newspaper. The editorship was a salaried, patronage position and one to which Connelly had been appointed by Lopez. Connelly regularly attended meetings of the Combined Caucus until he was named Chairman.

Woodrow Rancifer was chosen as Vice–Chairman of the Election Committee. Rancifer had been a member of the Combined Caucus since about 1976 and was a supporter of Lopez. Lopez had appointed Rancifer to the post of Chairman of the Local 1010 Committee on Political Education, a paid patronage job. While serving as Vice–Chairman of the Election Committee, Rancifer also served as Chairman of the COPE Committee.[1]

Like Connelly and Rancifer, Loreto Gonzalez was a crony of Henry Lopez. In fact, Gonzalez was Lopez's brother–in–law. Gonzalez became Secretary of the Election Committee. Prior to the 1976 election, Gonzalez had run for union office as a candidate on the Combined Caucus slate.

Shortly after being chosen as Chairman, Connelly took charge of the election and told Rancifer that since Connelly would have to take responsibility for the election, Connelly would give orders and Rancifer was to obey them. Pursuant to this stated philosophy, Connelly selected without consulting the Election Committee, an election captain for each polling site.[2] Each election captain chosen by Connelly was a supporter of the Combined Caucus and of Lopez. Each election captain was charged with supervising the activities of the Election Committee members working at his or her site and with instructing the Election Committee members under his or her captaincy in such of their duties as related to voter identification and voting by secret ballot.

The bylaws of the Union prescribed that the Election Committee was to elect three individuals to a special subcommittee. The members of the subcommittee were to be in attendance at the tabulation of the ballots and thereby were to serve a watchdog function. Each candidate for President was given by the bylaws the right to nominate an individual to be a member of the subcommittee. Balanoff paid a personal visit to Connelly and told him that he wished to nominate a Mr. Carpenter to the subcom-

1. Affidavit of Woodrow Rancifer at 1.

2. The record reflects that the estimates made under oath of the number of polling sites range from eleven to fourteen.

mittee. Although the bylaws did not prescribe the manner in which a Presidential candidate was to exercise his or her right to nominate, Connelly required that a nomination be submitted in writing before it could be accepted. Connelly claims that prior to the meeting at which the Election Committee was informed of the nominees and was asked to select the subcommittee, he did not tell anyone that he required that nominations had to be in writing.[3] Even so, Lopez submitted in writing the name of his nominee. Balanoff did not submit a written nomination. Lopez's nominee was named to the subcommittee. Balanoff's nominee was rejected.

On April 5, 1976, a meeting of the Election Committee and voting site captains was held. Storage of the ballots and the procedure by which votes would be identified on election day were discussed. Those present also determined that one voting booth would be installed at each voting site.

Over a period of twelve hours on April 8, 1976, the election of officers of Local 1010 was held. At the time of the election, Connelly and Lopez were both aware that the Department of Labor believed that federal law required that voting proceed in such a fashion that no voter be identified as the caster of any particular vote. Each was also aware that the failure to provide compartments at the polling sites into which individuals could go to cast their votes privately was one reason why the February, 1973 election for Director of District 31 had been overturned. Even so, at each polling site there was one voting booth at most and a number of tables at which votes could be cast. The membership of Local 1010 on April 8, 1976 numbered approximately 17,000.

Throughout the morning of April 8, 1976, many individuals walked into the voting sites to cast their votes carrying green cards on which the Rank–and–File slate of candidates was identified. At about one o'clock p. m. Dale Branson, a poll captain and a Combined Caucus enthusiast, spoke to Balanoff. Branson told Balanoff that Balanoff would win the election and then added:

Jim, you ain't going to be installed. The election is all screwed up already. We already have plans to go to the Labor Department. A new election is guaranteed.

At about three o'clock p. m., Henry Lopez confronted Balanoff at the North Gate at the Plant Number 2 balloting site. Lopez then told Balanoff that Balanoff would "never sit in the President's chair." Still later on election day, Raymond Lopez, the Secretary–Treasurer of the Election Committee, told Balanoff: "You might get in, but you will be out. This election is going to be out."

When the polls were closed, Connelly along with Brinks personnel in a Brinks truck made the rounds of the polling sites. At each site, the lists of eligible voters, the unused ballots, the challenged ballots, the accepted ballots, and the paper, pencils and other election–related materials were all picked up by the Brinks people. Under the supervision of the Brinks people, the ballots and election materials were secured for the night.

At approximately 8:30 a. m. on the morning after the election, the Election Committee met. By the time the meeting was called to order the Brinks truck in which the election ballots were secured had already arrived. On a number of occasions on the morning of April 9, 1976, Connelly spoke with Henry Lopez in Lopez's office. In mid–morning, Connelly directed that the counting and processing of the ballots be begun. Boxes containing the ballots were taken from the Brinks truck and tabulation of the election results begun. Ballots were processed initially by union members supervised by the Election Committee. Thereafter, the ballots were delivered by Brinks truck to an enterprise which the union had retained by contract to conduct with the use of a computer a count of the ballots cast during the election.

The unused ballots were separated from the other ballots. Connelly then ordered

3. Connelly deposition at 43.

that the unused ballots be taken to an incinerator in East Chicago, Indiana and burned.[4] The remainder of the ballots were then processed. On April 10, 1976, tabulation of the election results was completed. Balanoff defeated Lopez by a margin of almost two to one. A number of other candidates running on the Rank–and–File slate also defeated incumbent Combined Caucus members.

Within a few days after the election results had been tabulated, members of the Combined Caucus met. At the meeting, the members determined to challenge the election.

John Hurley, who had been a member of the Combined Caucus for a number of years, ran for re–election to the post of Vice–Chairman of the Grievance Committee in 1976. After being defeated in the April 8 election, Hurley went to see Joseph Festa, a staff representative of the United Steelworkers of America. When Hurley told Festa of his concern that the election had been carried out in violation of Federal law and asked for help, Festa advised him that he should voice his concern at a regular meeting of the union's members.

The Union held one of its regular meetings on April 15, 1976. Connelly admitted to those present that the unused ballots had been burned. At the meeting, Hurley protested that the April 8 election had been conducted in violation of Federal law.

Sometime after April 15, 1976 and at Hurley's suggestion, Festa drafted a letter for Hurley addressed to Walter J. Buske, then Secretary–Treasurer of the United Steelworkers of America. The letter voiced a protest of the April 8 election. Festa had his daughter–in–law type the letter. He then delivered it to Hurley for his signature on April 19, 1976. Shortly after receiving the letter from Festa, Hurley signed and mailed it.

On the same day that Festa delivered the protest letter to Hurley, Lopez called a number of the members of the union's Executive Board to a meeting in his office. Those present at the meeting were Lopez, Dave Brooks, Buddy Hill, C. C. Crawford, Wally Hartman, and Fred Jenkins. At the meeting, Lopez stated that he wanted the April 8 election overturned and instructed the members of the Executive Board there present to sign a letter of protest which had already been prepared. Brooks, Hill, Crawford, Hartman and Jenkins each signed the letter. Lopez did not. The letter was then returned to Lopez. Later on that day, Lopez gave Brooks a sealed envelope containing the letter and instructed Brooks to mail it. On the envelope, Lopez had placed Brooks' home address as the return address. The contents of the protest letter sent by Hurley were remarkably similar to the contents of the Lopez protest letter. In fact, the wordings of the two letters were in large part absolutely identical.

Mr. Buske of the United Steelworkers of America received both letters. The protests expressed were set down for hearing by a commission established by the Steelworkers. The hearing was held on June 3, 1976. Both Hurley and Lopez spoke. Lopez spoke first and at length. In the course of his presentation, Lopez brought a number of documents to the attention of the Commission. Hurley spoke later and only for about two minutes. Having received no ruling from the Steelworkers by July 19, 1976, three months after having invoked his intra–union remedies, Hurley lodged his protest with the Department of Labor on July 27, 1976. The Secretary thereafter brought this suit.

## II. Conclusions of Law

Defendant is a labor organization engaged in an industry affecting commerce as defined in 29 U.S.C. §§ 402(i) and 402(j). Defendant's elections are subject therefore to the provisions of Title IV of the Labor–Management Reporting and Disclosure Act of 1959, as codified in 29 U.S.C. § 481, *et*

---

4. At his deposition, Connelly explained his decision to order the burning of the unused ballots by stating: "It came on me that this mass of garbage had to get [out] of there." Connelly deposition at 95.

*seq.* The Court clearly has jurisdiction over suits of this type brought by the Secretary. 29 U.S.C. § 482(b).

### A. Review of the Secretary's Decision to Bring Suit.

Defendant argues, that the Court should enter judgment in its behalf for the reason that the Secretary's decision to bring this action was arbitrary and capricious. Defendant alleges that the Secretary brought this action even though he knew that those challenging the 1976 election were responsible for the violations of which they complained.

A decision of the Secretary not to file suit pursuant to 29 U.S.C. § 482 when a properly filed complaint has been brought to him or her by a member of a labor organization, is subject to judicial review. *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). A district court asked to review a refusal of the Secretary to file suit must examine the reasons the Secretary gives for his or her decision to determine whether the reasons given demonstrate that the Secretary's decision was so irrational as to be arbitrary and capricious. *Id.* at 572–573, 95 S.Ct. at 1860–1861.

Defendant argues that a decision of the Secretary not to bring suit pursuant to § 482(b) is indistinguishable from a decision of the Secretary to bring such a suit. A decision of the Secretary to prosecute a § 482(b) action, the defendant argues, is therefore subject to judicial review.

In fact, a decision by the Secretary to refrain from pressing the complaint of a labor organization member is quite different from a decision by the Secretary to file suit. Absent the availability of judicial review, an irrational decision of the Secretary not to press a § 482(b) complaint would go unrectified. Were judicial review of an irrational decision of the Secretary to bring a § 482(b) suit impermissible, however, the Secretary's error probably would prove harmless. By dismissal of the Secretary's complaint, by entry of summary judgment against the Secretary, or by verdict and final judgment adverse to the Secretary, a court could insure that reason triumphed.

The Administrative Procedure Act in pertinent part provides that agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are the only agency actions subject to judicial review. 5 U.S.C. § 704. The Secretary's decision to prosecute this civil action certainly constitutes "agency action" within the meaning of § 704. "Agency action" includes conduct by which an agency acts upon the application or petition of a person. 5 U.S.C. §§ 551(13) and 551(11).

The filing of this suit also must be deemed to be final agency action. The doctrine of finality is designed to prevent premature judicial intervention in the administrative process before the administrative action has been fully considered and before the legal dispute has been brought into focus. *Board of Education of City School District of Cincinnati v. Department of Health, Education and Welfare*, 396 F.Supp. 203 (S.D.Ohio 1975), *rev'd. in part on other grounds*, 532 F.2d 1070 (1976). The filing of this suit came about only after the Secretary had carried out his investigation of the allegations in Hurley's complaint. By the filing of this action, the Secretary signalled that the administrative proceedings had come to an end. Judicial review of the Secretary's decision to bring this action will not now cause any disruption of the Secretary's investigation of the veracity of Hurley's allegations. Nor will judicial review now prevent a sufficient focussing of the legal issues basic to this dispute. An order of an administrative agency may be deemed final when it imposes an obligation upon a party. *Cities Service Gas Co. v. Federal Power Commission*, 255 F.2d 860 (10th Cir.), *cert. denied*, 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958). The filing of this action imposed on defendant the obligation to defend this suit. *See Mobil Oil Corp. v. Federal Trade Commission*, 430 F.Supp. 849 (S.D.N.Y. 1977) (commencement of administrative proceedings by Federal Trade Commission without prior

preparation of an environmental impact statement deemed final agency action).

The LMRDA contains no provision prohibiting judicial review of a decision by the Secretary to bring a civil action against a union to set aside the results of a union election. Moreover, nowhere in the legislative history of the LMRDA is there any indication that Congress intended a decision by the Secretary to prosecute an action pursuant to § 482(b) to be unreviewable.[5]

Having determined that the Secretary's decision to file his complaint was reviewable, the Court now finds that the proper standard for judicial review is that enunciated in 5 U.S.C. § 706(2)(A). *Dunlop v. Bachowski*, 421 U.S. at 572–573, 95 S.Ct. at 1860–1861. Only when the Secretary's decision to bring suit pursuant to § 482(b) is so irrational as to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law should it be overturned.

To the extent that defendant argues that the Secretary's decision to bring this action was arbitrary and capricious, defendant could not be more wrong. The LMRDA expressly stipulates that election officials supervising a union election "shall preserve for one year the ballots and all other records pertaining to the election." It has never been disputed that Connelly as Chairman of the Election Committee ordered the day after the election that the unused ballots be burned. Nor has it been disputed that the order was obeyed. Moreover, the Secretary's conclusion that the 1976 election had not been carried out by secret ballot as required by 29 U.S.C. § 481(b) cannot be deemed arbitrary or capricious. The manner in which the voting occurred has never been disputed. To the Court's knowledge, nobody has ever denied that the Election Committee's failure to erect partitions in the polling places and to provide more than a paucity of voting booths permitted many voters while voting to see with only slight effort how others were voting. At the time the Secretary filed suit, the phrase "secret ballot" was defined in 29 U.S.C. § 402(k) as it presently is and *Brennan v. Local 3489, United Steelworkers of America*, 520 F.2d 516 (7th Cir. 1975), *aff'd.*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977), had been decided and publicized. At the time he filed suit, the Secretary had evidence that overwhelmingly demonstrated that the election rules prescribed by the LMRDA had been violated.

Defendant argues that even though the Secretary knew the 1976 election was conducted in violation of the LMRDA, the Secretary acted arbitrarily and capriciously in bringing the action at bar for the reason that the Secretary knew that the violations had been caused by those complaining to him. The Court cannot agree. Section 482(b) states only that the Secretary "shall" bring suit in the event that after investigating a properly filed complaint he or she finds probable cause to believe that a violation of the union election rules has occurred. On its face, § 482(b) does not require the Secretary to do more than determine that probable cause of a violation exists before filing a complaint. Even if the Court takes as given that the Secretary knew that those protesting the violations of the LMRDA election rules were the very ones responsible for the violations, the Court cannot conclude that the Secretary acted arbitrarily or capriciously or without the boundary of his authority in bringing the action at bar.

## B. The Existence of Violations of the LMRDA.

There is no doubt that the April 8, 1976 election was conducted in blatant defiance of the election rules set down by Congress in the LMRDA. In two respects, the election was held in violation of these rules. First, unused ballots were burned the day after the election in violation of 29 U.S.C. § 481(e). The Election Committee Chair-

5. *See* S.Rep. No. 187 and H.R.Rep. No. 741, 86th Cong., 1st Sess., *reprinted in* [1959] U.S. Code Cong. & Admin.News p. 2318 *et seq.*

man admitted at the April 15, 1976 meeting of the Union that the day after the election he ordered the incineration of the unused ballots. No party denies that Connelly's instructions were promptly carried out. Second, voting did not proceed by secret ballot as required by 29 U.S.C. § 481(b).

"Secret ballot," · as defined in the LMRDA, 29 U.S.C. § 402(k), means:

> the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed.

To accede to the mandate of the LMRDA, a union must make physical arrangements which permit each of its members who votes in a union election to vote in private. *Brennan v. Local 3489*, 520 F.2d at 521, 522. In the 1976 election, defendant used a loose polling procedure which permitted, if not encouraged, voters to look at each others' ballots as they voted. This sort of elbow-to-elbow voting has been found on a number of occasions to fall far short of the secret ballot requirement prescribed by the LMRDA. *Brennan v. Local 3489*, 520 F.2d at 521, 522; *Hodgson v. United Mine Workers of America*, 344 F.Supp. 17, 30 (D.D.C. 1972).

Having found that the 1976 election was conducted so as to violate 29 U.S.C. §§ 481(b) and 481(e), the Court now considers whether the Secretary is due the remedy he seeks—vacation of the 1976 election and the holding of a new election.

### C. The Propriety of a Rerun Election.

■ The circumstances under which vacation of the old election and the holding of a new election are warranted are identified in 29 U.S.C. § 482(c). Section 482(c) provides in pertinent part:

> If, upon a preponderance of the evidence after a trial upon the merits, the court finds—... (2) that the violation of section 481 of this title may have affected the outcome of the election, the court shall declare the election, if any, to be void and

direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization.

For two reasons the Court finds on the peculiar facts of this case that vacation and rerun is not warranted as a remedy. First, the Court cannot find that either the incineration of the unused ballots or the failure to ensure voting by secret ballot may have affected the outcome of the election within the meaning of § 482(c)(2). Second, the Court finds that an implied exception to the dictates of § 482(c) exists in those rare cases such as the case at bar in which a union office–holder or incumbent union faction breaches the LMRDA election rules, loses an election, and then by complaining to the Department of Labor spurs the Secretary to commence a § 482(b) federal action to undo the election.

■ When a violation not susceptible of qualification has been shown by a preponderance of the evidence to have been committed in the course of an unsupervised election, the existence of the violation makes out a prima facie case that the outcome of the election may have been affected. *Wirtz v. Hotel Employees Local 6*, 391 U.S. 492, 505–509, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968). *See also Usery v. Local 639, International Brotherhood of Teamsters*, 543 F.2d 369, 379 (D.C. Cir. 1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). The prima facie showing can of course be countered by evidence which supports a finding that the violation did not affect the result. *Wirtz v. Hotel Employees Local 6*, 391 U.S. at 507, 88 S.Ct. at 1752.

The legislative history recording the genesis of § 482(c) is instructive of what meaning Congress intended to impute to the phrase "may have affected" as that phrase is used in § 482(c)(2). The "may have affected" language first appeared in a bill the Senate passed, S. 3751, in the 85th Congress which died in the House of Representatives. The report on S. 3751 stated:

Since an election is not to be set aside for technical violations but only if there is reason to believe that the violation has *probably* affected the outcome of the election, the Secretary would not file a complaint unless there were also probable cause to believe that this condition was satisfied. (report's emphasis).[6]

In the 86th Congress, the "may have affected" language as incorporated in S. 1555, a bill very similar to S. 3751, was endorsed by the Senate. Commenting on the meaning of the "may have affected" language as used in that section of S. 1555 which was later to become 29 U.S.C. § 482(c), the Senate report on S. 1555 states:

Section 302(c): Provides for a trial of the issues in proceedings or action brought under this section by the district court. If the court, upon a preponderance of this evidence, finds that (1) an election was not held within the time prescribed by section 301, or (2) a violation of section 301 did or *reasonably could have been expected to affect* the result of an election, the court is to declare the election void and direct the holding of a new election under supervision of the Secretary of Labor. (Court's emphasis).[7]

█ The bill passed by the House, H.R. 8342, however, authorized rerun elections where a federal district court found that the violation in fact "affected" the outcome. The Conference Committee approved the Senate's use of the phrase "may have affected" and the phrase became law as incorporated in § 482(c)(2).[8] Nothing in the legislative history of § 482(c)(2) indicates that Congress did not intend the "may have affected" language in § 482(c)(2) to have the meaning the Senate intended the

phrase to have when it placed the phrase in S. 1555 in 1959.[9] The Court therefore determines that before a district court can conclude that a violation may have affected the outcome of an election within the meaning of § 482(c)(2), the court must find that the violation reasonably could have been expected to affect the result of the election.

The incineration of unused ballots after the voting in the 1976 election had concluded cannot be deemed a violation that reasonably could have been expected to affect the results of the election. The unused nature of the ballots and post–balloting timing of the act of destruction both militate against such a conclusion. *See Brennan v. Sindiceto Empleados de Equipo Pesado, Construccion y Ramas Anexas, Inc.,* 370 F.Supp. 872, 880 (D.P.R. 1974).

Nor can the Court conclude that the failure to ensure voting by secret ballot may have affected the outcome of the election. Those standing most to gain from the absence of private voting booths or compartments were the incumbents, the Combined Caucus members.[10] The captains at the polling sites were Lopez loyalists. They controlled activity at the polling areas and were in positions to exercise their authorities to see for whom the union members were voting. Those able to observe how particular members voted could be expected to share what they had observed with Lopez and the other Combined Caucus officers. Thus, one could expect that upon entering the voting areas members might have feared that they would be penalized in the event that they voted against the Combined Caucus office–holders then in power. If the absence at the polling sites of private

---

**6.** S.Rep. No. 1684, 85th Cong., 2d Sess., 13 (1958).

**7.** S.Rep. No. 187, *supra*, note 5, U.S.Code Cong. & Admin.News 1959 at 2368.

**8.** H.R.Conf.Rep. No. 1147, 86th Cong., 1st Sess., 35, *reprinted in* [1959] U.S.Code Cong. & Admin.News p. 2507.

**9.** *See* S.Rep. No. 187 and H.Rep. No. 741, *supra*, note 5; H.R.Conf.Rep. No. 1147, *supra*, note 8.

**10.** Indeed, one tribunal has asserted that ". . . secrecy and safeguards are for the benefit of the challenger and the absence of secrecy and safeguards can only benefit the incumbent who controls the machinery of the union and can affect votes through fear or hope of favor." *Bachowski v. Brennan,* 413 F.Supp. 147, 150 (W.D.Pa.), appeal dismissed, 545 F.2d 363 (2d Cir. 1976).

voting booths or compartments could be expected to have been prejudicial to a particular slate, one would expect that it would have been prejudicial to the Rank–and–File. Yet, defendant has produced evidence that the Rank–and–File won the election in a landslide.[11]

Moreover, defendant advances other evidence that the outcome of the election was not affected by the breach of the LMRDA secret ballot rule. On the day of the election, a great number of union members were observed carrying green cards identifying Rank–and–File candidates with them into the voting areas. These members had discarded Combined Caucus materials and had determined before they even reached the polling sites to vote the Rank–and–File slate. That so many determined in advance to support the Rank–and–File candidates and then voted accordingly raises doubt that the violation of the LMRDA secret ballot rule may have affected the outcome of the election. It is not reasonable to consider that if voting had been by secret ballot, the Combined Caucus might have prevailed.

Regardless of whether the violation of the secret ballot rule may have affected the outcome of the election, however, a vacation–and–rerun remedy is not warranted for a second reason. Congress could not have intended to permit an incumbent union faction which intentionally violated the LMRDA election rules while losing an election to secure invalidation of the election by suit of the Secretary of Labor.

The LMRDA was enacted in the light of the extensive congressional inquiry which had identified many of the abuses by which union office–holders had used the inherent power of their offices to emasculate challenges to their leadership by the rank and file, and thereby to perpetuate dynastic control of a number of unions. *See* Report of the Senate Committee on Improper Activities in the Labor or Management Field, S.Rep.No.1417, 85th Cong., 2d Sess, (1958), U.S.Code Cong. & Admin.News 1959, p. 2318; 29 U.S.C. § 401(b). Aware of the danger that union leaders would abuse their power to the detriment of the rank and file members, Congress devised the election rules contained in Title IV as a prophylactic measure. *Trbovich v. United Mineworkers of America,* 404 U.S. 528, 530, 531, 92 S.Ct. 630, 632, 633, 30 L.Ed.2d 686 (1972); *Wirtz v. Hotel Employees Local 6,* 391 U.S. at 499, 503, 88 S.Ct. at 1748, 1750.[12] Title IV's primary function is to insure "free and democratic" elections. *Wirtz v. Local 153, Glass Bottle Blowers Association,* 389 U.S. 463, 470, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1968).

The record makes clear that the Combined Caucus, led by Lopez, controlled the Election Committee and orchestrated the election proceedings. It is not disputed

---

**11.** In the contest for President, for example, Balanoff of the Rank–and–File Caucus outpolled Lopez of the Combined Caucus by a vote of 6084 to 3081. Defendant's Answers to Plaintiff's Requests for Admission filed November 3, 1977 at 5.

**12.** "It needs no argument to demonstrate the importance of free and democratic union elections. Under the National Labor Relations and Railway Labor Acts the union. which is the bargaining representative has power, in conjunction with the employer, to fix a man's wages, hours, and conditions of employment. The individual employee may not lawfully negotiate with his employer. He is bound by the union contract. In practice, the union also has a significant role in enforcing the grievance procedure where a man's contract rights are enforced. The Government which gives unions this power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom they represent. The best assurance which can be given is a legal guaranty of free and periodic elections. The responsiveness of union officers to the will of the members depends upon the frequency of elections, and an honest count of the ballots. Guaranties of fairness will preserve the confidence of the public and the members in the integrity of union elections." S.Rep.No.187, *supra,* note˜5, at 2336; H.Rep.No.741, *supra,* note 5, U.S.Code Cong. & Admin.News 1959 at 2438.

Defendant correctly notes that the LMRDA was enacted not only to protect the democratic rights of the union rank and file but also to further the public interest. *See* 29 U.S.C. § 401(a); *Trbovich v. United . Mine Workers,* 404 U.S. at 538, 539, 92 S.Ct. at 636, 637.

that on election day, three different Combined Caucus members, including Lopez and one of the three members of the Election Committee, told Balanoff that the election would be overturned. Finally, the autocratic chairman of the Election Committee was a Lopez loyalist who ordered that unused ballots be burned and required that voting proceed without guarantees of privacy, all the while knowing that he was ensuring that the LMRDA election rules would be flagrantly violated.

Responsible for the violations of which they complain, the Combined Caucus leadership cannot now rely on the violations to achieve the upsetting of the election. Were the Court to honor the Secretary's request for vacation of the 1976 election and for the holding of a new election, the Court would be endorsing one of the very vices that Congress intended the LMRDA to curb. Congress did not intend to permit union office–holders to torpedo union elections so as to ensure that they not be ousted from office.

 The Secretary argues that after federal suit is filed he represents the interest of the public and not the interest of the complaining union member who protested the election in question to the Secretary. Whether the hands of the complaining union member or faction are clean or unclean, so the Secretary alleges, is immaterial. With the Secretary's view, the Court cannot agree. If the manner in which the complaining member or faction behaved during the election period was not material, a union's leadership in anticipation of being removed from power could torpedo an election and thereby secure a rerun election and a second chance at maintaining their positions. To deprive Balanoff and the other Rank–and–File candidates of the offices which they fairly won would be totally inconsistent with the language and history of the LMRDA. Where an insurgent is victorious in an election in spite of conduct by an incumbent office–holder that is violative of

the Act and beneficial to the insurgent's foes, the Act does not permit the election of the insurgent to be overturned. *Usery v. Stove, Furnace & Allied Appliance Workers International Union*, 547 F.2d 1043, 1047 (8th Cir. 1977).[13]

The entry of summary judgment is appropriate where the record reflects no genuine issue of material fact. F.R.Civ.P. 56. For the reasons expressed and being duly advised in the premises, the Court now DENIES plaintiff's motion for partial summary judgment and GRANTS defendant's motion for summary judgment.

The Court therefore ORDERS and ADJUDGES that judgment shall be entered for defendant.

---

**13.** The refusal of the Eighth Circuit Court of Appeals to invalidate the election of Thomas Kemme in this case is supportive of this

Court's refusal to invalidate the April 8, 1976 election.