USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1483

 ALEXIS M. HERMAN, SECRETARY OF LABOR,
 UNITED STATES DEPARTMENT OF LABOR,

 Plaintiff, Appellant,

 v.

 SPRINGFIELD MASSACHUSETTS AREA, LOCAL 497,
 AMERICAN POSTAL WORKERS UNION, AFL-CIO,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Frank H. Freedman, Senior U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 
 
 
 Nathaniel I. Spiller, Deputy Associate Solicitor, Department
of Labor, with whom Henry L. Solano, Solicitor of Labor, Allen H.
Feldman, Associate Solicitor for Special Appellate and Supreme
Court Litigation, and Mark S. Flynn, Senior Appellate Attorney,
were on brief for appellant.
 Craig D. Robinson with whom Brousseau & Robinson was on brief
for appellee.
 Leon Dayan with whom Laurence Gold and Bredhoff & Kaiser,
P.L.L.C. were on brief for United Steelworkers of America, Amicus
Curiae.

January 6, 2000

 BOUDIN, Circuit Judge. This appeal involves the validity
of an eligibility requirement imposed by a union on candidates for
officer positions. The union, which is a Springfield,
Massachusetts local of the American Postal Workers Union, holds
officer elections once every three years. Under its constitution,
a candidate for office must have been a member of the union for at
least one year (two, if running for president) and--this is the
disputed provision--must have attended at least three of the
local's regular monthly meetings in the twelve month period before
the meeting at which nominations are made.
 The union holds meetings nine months of the year (all
months but July, August and December), so to be eligible a
candidate must attend one third of the nine scheduled meetings. A
member is also credited with attending if he does not attend but
has an excused absence justified by job requirements or "other
compelling reasons"; excuses can be granted by vote of the
membership at the missed meeting (if the excuse request is
submitted in advance) or at the next meeting. Ultimately, the
question for us is whether the three-meetings requirement conforms
to the statutory requirement that 
 every [union] member in good standing shall be
 eligible to be a candidate and to hold office
 (subject to . . . reasonable qualifications
 uniformly imposed).

Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29
U.S.C. 481(e).
 In March 1997, union members nominated candidates for
office, but three nominees were declared ineligible because they
had failed to satisfy the three-meetings requirement. After the
nomination meeting, a union member exhausted internal remedies and
then, following the election in May 1997, filed a protest with the
Secretary of Labor challenging the election on the ground, inter
alia, that the three-meetings requirement was invalid. The
Secretary thereafter brought suit against the union in the district
court under the LMRDA, 29 U.S.C. 482(b), which in substance
empowers the court to provide equitable relief for violations of
section 481, including its eligibility provision quoted above. 
Alleging such a violation, the Secretary sought to set aside the
election.
 On cross motions for summary judgment, the district court 
ruled in favor of the union after concluding that the three-
meetings requirement is a "reasonable qualification" under section
481(e). The Secretary has appealed, stressing that the requirement
disqualified over 96 percent of the union membership. The union,
supported by a very helpful amicus brief from another union (the
United Steelworkers), supports the district court's decision. The
appeal turns on issues of law which we consider de novo. Philip
Morris Inc. v. Harshbarger, 122 F.3d 58, 62 (1st Cir. 1997).
 In enacting the LMRDA, Congress was concerned with abuses
in the labor movement, including not only corruption but attempts
by incumbent union leadership to entrench itself further. Local
3489, United Steelworkers v. Usery, 429 U.S. 305, 309-10 (1977)
("Steelworkers"); Wirtz v. Hotel, Motel & Club Employees Union,
Local 6, 391 U.S. 492, 497-98 (1968). Section 481(e) aimed to
improve union democracy by making it easier for rank and file
members to participate in union governance. Hotel, Motel & Club
Employees Union, 391 U.S. at 497-98. For that reason, the
Secretary and the courts have approached skeptically qualification
requirements of the kind at issue in this case. Those that impose
an appreciable burden on members--to attend many meetings or to
decide to do so long in advance of election--usually fail.
 Still, the courts have purported to make "reasonableness"
a case-specific issue, turning on all of the circumstances, e.g.,
Steelworkers, 429 U.S. at 313; Local 1402, Int'l Longshoremen's
Ass'n, 617 F.2d at 98-99; and the Secretary says that attendance
requirements can serve legitimate ends in ensuring that candidates
are educated about union affairs. 29 C.F.R. 452.38(a) (1999). 
Union election by-laws have sometimes been crudely exclusionary,
e.g., Hotel, Motel & Club Employees Union, 391 U.S. at 500-01, and
it is easy to be cynical about motive; but there is no per se ban
on all meeting-attendance requirements.
 Instead, the courts have concerned themselves primarily
with evaluating the extent of the burden imposed by the
requirements at issue and their impact on candidacies. Burden and
impact are not quite the same thing, since a burdensome requirement
might still be met by many union members (e.g., if it were common
practice for most members to attend most meetings) and a slight
condition (e.g., attending the nomination meeting) might in
practice be met by very few union members. Reversing the district
court's approach, let us begin with burden and return then to
impact, which presents the more difficult issue in this case.
 To make a refined judgment of burden, one would need a
great deal of specific information about actual practice in each
case. For example, one would need to know just how inconvenient is
attendance for members of a particular union (which depends on the
location(s) of meetings, the hour and length of the meetings, the
distance from home or job of the member, and so on), and whether
there are other incentives for members to attend meetings, as well
as the nature and operation of any excuse regime. But it is rare
that either side offers such detailed information, let alone
reliable evidence, which might well require surveys and statistics.
 In the absence of such evidence, courts tend to make what
they think are "common sense" judgments based on how many meetings
members must attend, over what period of time, whether excuses are
allowed, and how long in advance a candidate would have to decide
to run in order to fulfil the conditions. E.g., Steelworkers, 429
U.S. at 313; Local 1402, Int'l Longshoremen's Ass'n, 617 F.2d at
98-99. As the numbers of excluded members go up, so does the
courts' readiness to find that the burden outweighs the supposed
(and inherently speculative) benefits of the requirement in
educating the candidate or demonstrating commitment. See cases
cited at note 1, above.
 By the standards of prior decisions, the qualification
requirements in this case are certainly at the less burdensome end
of the spectrum. The candidate need attend only three of the nine
meetings in the year prior to the nomination meeting; the decision
to run could be made as late as four months before the nomination
meeting; and an excuse regime exists that would allow credit for a
meeting not actually attended on a showing of job requirements or
other compelling reasons. Most of the leading cases striking down
requirements have dealt with ones at least marginally more
demanding.
 Of course, if one believed that meeting attendance
requirements serve no purpose but to ward off challenges to
incumbent union leaders, any burden at all might suffice to condemn
them. But the amicus offers some commentary to the contrary--
principally a statement by former Labor Secretary Ray Marshall, an
expert in labor matters--and, more important, the Secretary does
not assert that all meeting attendance requirements are a useless
sham or point us to any evidence to support such a position. If
and when the Secretary does so, it will be time enough to revisit
that basis for banning the requirements.
 Instead, the Secretary's attack on the district court
decision rests almost entirely on the alleged impact of the
attendance requirements in this case, on her reading of case law,
and on the deference she says is due to her judgment. The main
datum relied on by the Secretary is the fact, conceded by the
union, that over 96 percent of the members of the local in this
case did not in practice attend enough meetings to qualify to run
for office. Put differently, when the nomination meeting arrived,
less than 4 percent of the local's membership could run for office.
 There is nothing crazy about the view professed in the
Secretary's brief that any requirement disqualifying so many
potential candidates should be automatically deemed unreasonable. 
Such a rule would be easily administered (once one chooses the
fatal percentage); it would lessen the need for speculative
judgments about actual burden; and it would enlarge "union
democracy" by providing a larger body of possible candidates
(albeit while contracting the unions' ability to manage their own
affairs). But to make a percentage test conclusive is not the most
natural reading of the statute or the governing precedents, and
there is doubt about the Secretary's own position--outside of this
litigation.
 The statutory "reasonableness" test in section 481(e)
does not have much inherent content but, as already noted, the main
thrust of the decisions implementing it is to consider election-
qualification requirements on a case by case basis, taking account
of all relevant factors and not just one. True, the Secretary's
brief reads Steelworkers as making conclusive the percentage of
members excluded; but while the dissenting opinion in that case so
accused the majority, Steelworkers, 429 U.S. at 315 (Powell, J.,
dissenting), the majority avoided any such explicit holding, id. at
310-13, and the facts of the case involved a requirement--
attending one half the monthly meetings in the prior three years--
that was far more burdensome than the requirement at issue in this
case. 
 Further, looking at "impact" solely from the nomination
day perspective is misleading. Since most union members do not
intend to run for office in a given election, most are not going to
trouble to meet any precondition that requires them to do anything
different from what they ordinarily do--no matter how slight the
burden or how reasonable a condition for those who do wish to be
candidates. Suppose that the union required all candidates to send
in a postcard 10 days before the election or to collect three
signatures prior to the election; probably, at least 96 percent of
the membership would on the day of the election still be
disqualified from running for office.
 One circuit court decision does--to some extent--support
the view taken in the Secretary's brief. In Doyle v. Brock, 821
F.2d 778 (D.C. Cir. 1987), a divided panel overturned the
Secretary's refusal to sue to enjoin a meeting attendance
requirement obligating a candidate to attend at least one half of
the monthly meetings in the prior year. That requirement (viewed
ex post) also disqualified a high percentage of candidates. 
Pointing to Steelworkers' emphasis on such percentages, Judge
Edwards (joined by a visiting judge) held that the Secretary had
not adequately explained his refusal to challenge the union. 
Doyle, 821 F.2d at 785-86.
 However, Doyle was rendered over a dissent by Judge
Silberman, id. at 787-89, and over strenuous arguments from the
Secretary that Steelworkers did not create a per se rule, see id.
at 784. Further, the facts in Doyle addressed a requirement
somewhat more burdensome than the one before us, compelling
attendance at six meetings (instead of three) and a head start of
about six months (instead of four). Finally, if Steelworkers is
taken to impose a rigid, one-factor test based on percentage, much
of the opinion becomes surplusage, particularly the section in
which the Court approved the Secretary's own flexible, multi-factor
test for reasonableness. 429 U.S. at 311-13.
 This brings us to the Secretary's more interesting
argument, namely, that her present position on what is a reasonable
qualification is entitled to substantial deference from the courts. 
Traditionally, the most deference is due to decisions by agencies
made pursuant to delegated power, cf. Chevron U.S.A., Inc. v.
Natural Resources Defense Council, 467 U.S. 837 (1984), an
authority that the Secretary does not claim here. But we have
ourselves said that some weight is due even to interpretative rules
that express merely the view on the matter at hand taken by the
agency charged with enforcement. This deference does not depend
on notions of delegation but on the expertise and comparative
neutrality of the agency involved.
 But there are major difficulties with according such
deference here. So far as the Secretary's position is based simply
on a reading of Steelworkers, our own competence in parsing that
decision is equal to that of the Secretary. See Valerio v. Putnam
Assocs. Inc., 173 F.3d 35, 43 n.5 (1st Cir. 1999) (court not bound
by agency's interpretation of judicial precedent); accord Atchison,
Topeka & Santa Fe Ry. Co., 44 F.3d at 443. Indeed, as Doyle makes
clear, the Secretary previously shared our view of the Steelworkers
decision. See Doyle, 821 F.2d at 784.
 Further, even in her modified interpretative regulation
adopted after Doyle, the Secretary has taken an ambiguous position. 
The text of the regulation continues to assert that attendance
requirements may be reasonable and that "reasonableness must be
gauged in the light of the circumstances of the particular case,"
including, among other considerations, burden, excuse provisions,
and impact. 29 C.F.R. 452.38(a). Only in the new "case law"
footnote at the end does the Secretary, citing Doyle, say that the
exclusion of a "large portion of members" alone "may" render an
attendance requirement unreasonable. Id. at n.25.
 Thus, in her most recent formal statement of position,
the Secretary has sought to have it both ways, supporting the union
position in text but appending a footnote reference to Doyle that
is more of a disclosure than an endorsement. Certainly the
Secretary's brief in this court is unqualified in supporting some
percentage test as determinative--indeed, the brief scarcely
mentions burden--but courts normally decline to defer to what may
be the ad hoc position of counsel rather than the judgment of the
administrator. See, e.g., O'Connell v. Shalala, 79 F.3d 170, 179
(1st Cir. 1996); Massachusetts v. Blackstone Valley Elec. Co., 67
F.3d 981, 991 (1st Cir. 1995).
 We might well decide this case differently if the
Secretary adopted an interpretative regulation setting forth a
conclusive percentage test. This is not the most natural or
traditional reading of the statute, but there are policy arguments-
-a few already mentioned--for this result, assuming (as we do) that
the statute affords some latitude for the expert administrator to
devise an enforceable regime. And while Steelworkers does not
compel such a percentage test, arguably Steelworkers would permit
it, if based on the Secretary's independent judgment.
 Such a flat percentage test would largely eliminate
meeting attendance requirements and repudiate prior positions of
the Secretary, and might therefore require more explanation than is
normally required for a regulation, but agencies are entitled to
change their views. Strickland v. Commissioner, Maine Dep't of
Human Servs., 48 F.3d 12, 20 (1st Cir.), cert. denied, 516 U.S. 850
(1995); Massachusetts v. Lyng, 893 F.2d 424, 431 (1st Cir. 1990). 
Despite the able arguments of the amicus union, we do not attach
much weight to the prevalence of such meeting attendance
requirements in the past--a past not without abuses--or to
Congress's failure to ban them outright, which falls far short of
implicit approval.
 In sum, if the Secretary has the courage of her counsel's
convictions, she can revise her interpretative regulation, adopt a
flat percentage test, and eventually bring an enforcement action
outside the D.C. Circuit to test her position. There are
apparently plenty of candidates, including the very unions involved
in this case. Obviously, we do not commit ourselves as to the
outcome but, with a clear-cut regulation adopted by the Secretary,
in place of the current straddle, this would at least be a close
contest.
 Affirmed.