**Elaine L. CHAO, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**LOCAL 1357, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Defendant.**

**Civ. No. 01–00367 SOM/BMK.**

United States District Court, D. Hawaiʻi.

Oct. 22, 2002.

Theodore G. Meeker, Asst. U.S. Atty. (Second Chair), Honolulu, HI, Barbara A. Matthews (Lead Counsel), U.S. Dept. of Labor, Office of Regional Sol., San Francisco, CA, for Plaintiff.

Rebecca L. Covert, Takahashi Masui & Vasconcellos, Honolulu, HI, for Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MOLLWAY, District Judge.

### I. INTRODUCTION.

Plaintiff Secretary of Labor (the "Secretary") has filed this suit under Title IV of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 481–83 (the "LMRDA"). The Secretary claims that Local 1357, International Brotherhood of Electrical Workers, AFL–CIO ("Local 1357") violated Title IV of the LMRDA by disqualifying George Waialeale ("Waialeale"), a member in good standing, from running for the position of Local 1357's Business Manager–Financial Secretary in its February 2001 election. The election judge removed Waialeale's name from the

ballot after learning in December 2000 that the International Brotherhood of Electrical Workers (the "IBEW") had deemed Waialeale ineligible to run for office.

In 1999, the IBEW had found Waialeale, who had been Business Manager–Financial Secretary of Local 1357 from 1989 to 1998, guilty of spending $80,499.92 without proper documentation and approval during his term as Business Manager–Financial Secretary, in violation of the IBEW Constitution, Local 1357 Bylaws, and Local 1357 rules and policies. The IBEW barred Waialeale from holding office for five years and ordered him to make restitution of $80,499.92 to Local 1357 or face expulsion from the IBEW.

The Secretary claims that the IBEW's discipline of Waialeale violated Title I of the LMRDA because Waialeale had not been served with specific written charges and, consequently, had not had a reasonable time to prepare his defense and had not had a full and fair hearing. 29 U.S.C. § 411(a)(5). Arguing that Local 1357 violated Title IV of the LMRDA by disqualifying Waialeale as a candidate in the February 2001 election, the Secretary asks the court to order Local 1357 to hold a new election under the Secretary's supervision pursuant to Title IV of the LMRDA.

The court held a four-day bench trial from October 8, 2002, to October 11, 2002. Based on the evidence presented at the trial, the court finds that the Secretary has not shown that Local 1357 violated Title IV of the LMRDA by disqualifying Waialeale in the February 2001 election.

## II. *FINDINGS OF FACT.*

Whenever, in the following discussion, this court has mistakenly designated as conclusions of law what are really findings of fact, and vice versa, the court's statements shall have the effect they would have had if properly designated.

This bench trial was conducted in accordance with this court's trial procedures for civil nonjury trials, which are reproduced, in substantially the same form followed here, in Appendix A to this court's decision in *Kuntz v. Sea Eagle Diving Adventures Corp.*, 199 F.R.D. 665 (D.Haw.2001). Direct testimony was presented primarily in writing, with witnesses then subject to live cross-examination and redirect examination unless waived. Three witnesses (Harold Dias, Jr., Timothy Dixon, and Michael Mowrey) supplemented their written direct testimony with oral direct testimony. The Secretary presented fifteen witnesses (Carin Lim, Pearl Moenahele, Gerald Miura, Henry Okazaki, Maile Harris, Roy Amano, Bernadette Tomas, Koji Minami, Lorraine Pa, Kenneth Matsumiya, George Stender, Jr., Harold Dias, Jr., Karenann Wedge–Lewis, Timothy Dixon, and Michael Mowrey). Local 1357 presented five witnesses (Timothy Dixon, Harold Dias, Jr., Michael Mowrey, Jeremiah Genovia, and William Eads).

For ease of reference by the parties and the court, the following findings are presented in numbered paragraphs.

1. Local 1357 is a labor organization engaged in an industry affecting commerce within the meaning of the LMRDA, 29 U.S.C. § 402(i). Defendant Local 1357's principal office is located at 2305 South Beretania Street, Honolulu, Hawaii 96826. Dias Decl. ¶ 4.

2. Waialeale held the position of Business Manager–Financial Secretary of Local 1357 from March 1989 through February 1998. The Financial Secretary keeps the books and records of Local 1357. The Business Manager is the principal officer of Local 1357 and is responsible for "results in organizing his jurisdiction, for establishing friendly relations with employers, and for protecting the jurisdiction of the IBEW." IBEW Constitution Art. 16

Sec. 2, Art. 17 Sec. 8 (Ex. 1). These two positions may be combined, and the Business Manager–Financial Secretary is the only full-time officer of Local 1357. In an election in February 1998, Waialeale was defeated by Harold Dias, Jr. ("Dias"). Dias assumed the office of Business Manager–Financial Secretary the next month. Dias Decl. ¶¶ 7–9.

3. Koji Minami ("Minami") was the President of Local 1357 from March 1992 through February 1998. Minami ran for re-election in February 1998 and was defeated by George Stender, Jr., who took office in March 1998. Minami Decl. ¶ 3; Dias Decl. ¶ 15; Stender Decl. ¶ 7. The President, like Local 1357's other officers (other than the Business Manager–Financial Secretary), receives only nominal compensation for performing official duties.

4. Shortly after Dias became Business Manager–Financial Secretary, he asked Minami to examine Local 1357's finances. Minami spent approximately four days doing so. Minami Decl. ¶¶ 17, 19; Dias Decl. ¶¶ 11–12.

5. Minami testified that new business managers routinely conduct audits of the financial records of outgoing business managers. Trial Test. of Minami (10/9/02).

### The Miura Report

6. As part of his investigation into Local 1357's finances, Dias also hired Gerald Miura ("Miura"), a Certified Public Accountant, to review Local 1357's finances. Miura Decl. ¶ 8. Dias first asked Miura to perform a "cash audit," in which Miura reviewed Local 1357's bank accounts and outstanding checks to confirm the account balances and to reconcile the accounts with the financial statements. Miura concluded that the bank accounts "appeared to be correct" and that there were no financial irregularities. Miura Decl. ¶¶ 8–11.

7. Dias then asked Miura to examine some of Local 1357's expenditures. On or about June 22, 1998, Miura submitted his report on that subject (the "Miura report") to Dias. Miura Decl. ¶¶ 12, 15; Miura Report (Ex. 8).

8. The Miura report reviewed financial transactions that had occurred from October 1, 1994, through March 15, 1998. The Miura report was an "Agreed Upon Procedures Report," which is a term used by the American Institute of Certified Public Accountants ("AICPA") to describe the undertaking of accounting services based on agreed-upon procedures between the client and the accountant. Miura Decl. ¶¶ 14, 17; Miura Report (Ex. 8).

9. In preparing the Miura report, Miura reviewed the IBEW Constitution, the Bylaws of Local 1357, the Financial Code of Local 1357, and Local 1357's Authorization and Approval of Local Union Salaries and Expenditures. The Miura report concluded that certain expenditures made during the reviewed time period had not complied with the provisions of those documents. Miura Decl. ¶¶ 20, 22–23; Miura Report (Ex. 8).

10. The Miura report listed the dates, payees or vendors, check numbers if applicable, and amounts of the cash disbursements and credit card charges that appeared to violate the relevant rules and procedures governing Local 1357 expenditures. Each transaction was placed in one or more of four categories: (1) Transactions made without Executive Board Approval; (2) Transactions appearing to lack sufficient detail and information; (3) Transactions appearing to lack supporting documents; and (4) Transactions appearing to be proper or "status not determined." Miura Report (Ex. 8).

11. The introduction to the Miura report also listed the specific provisions of Local 1357 Bylaws and rules and policies that were apparently violated by the listed expenditures. Introduction to Miura Report (Ex. 8).

### The Charges

12. In August 1998, copies of the Miura report were prepared for Local Union Representatives to take to Local 1357's August unit meetings. Jeremiah C. Genovia ("Genovia"), Local 1357's Assistant Business Manager, took a copy of the Miura report to the Unit 9 meeting in Leeward Oahu and informed those in attendance that he had a copy of the Miura report available for review if anyone was interested. Other Local Union Representatives attended other unit meetings of Local 1357. Genovia Decl. ¶ 3.

13. Minami looked at the Miura report at a unit meeting in August 1998. Minami testified that there was "heated discussion" among the union members about the report. At the meeting, Minami announced that he would be filing charges based on the Miura report and asked if anyone wanted to join him. A number of members raised their hands. Trial Test. of Minami (10/9/02). On September 15, 1998, Minami and five other members of Local 1357 filed charges against Waialeale with Michael Mowrey ("Mowrey"), the International Vice President of IBEW for the Ninth District, based on the Miura report. The Ninth District includes Hawaii. Letter to Mowrey from Minami et al. of Sept. 15, 1998 (Ex. 9) (the "Charging Letter"); Mowrey Decl. ¶ 1.

14. The Charging Letter stated that it was based on "the recent audit conducted by the independent auditor." The reference to "the recent audit" was a reference to the Miura report. The Charging Letter alleged that Waialeale had made "very disturbing disbursements ... in that he did not go through the proper approval procedures, and there is also some very questionable expenditures [sic] of a personal nature." Although the Miura report had covered the period from 1994 to 1998, the Charging Letter referred only to the period from March 1996 through March 1998.

The letter also stated that the report "was broken down into four categories (a: Need Board Approval; b: Business Managers Account; c: No supporting Documents; and d: Legitimate use)." Charging Letter at 1; Trial Test. of Minami (10/9/02).

15. The Charging Letter charged Waialeale with having spent thousands of dollars "without Executive Board approval." The Charging Letter also stated, "As Financial Secretary of Local Union 1357 George Waialeale duties [sic] were to ensure that proper documentation on expenditures of the Local Union were of a[l]legitimate nature. His failure to maintain proper records casts doubt as to the legitimacy of the expenditures, thousands of dollars were spent with out [sic] proper documentation or no documentation at all. Therefore we must file charges against George Waialeale...." Charging Letter at 1 (Ex. 9).

16. The Charging Letter charged Waialeale with having violated specific provisions of the IBEW Constitution and the Local 1357 Bylaws. One paragraph cited violations of Article XXVI, Section 11; Article XIX, Sections 5 and 7; and Article XVIII, Section 4 of the IBEW Constitution, as well as violations of Article X, Sections 1, 4(b), and 5, of the Local 1357 Bylaws. Another paragraph charged Waialeale with violations of Article XIX, Section 4, and Article XXVI, Section 11, of the IBEW Constitution, and Article X, Sections 1 and 4 of the Local 1357 Bylaws. Charging Letter at 1 (Ex. 9).

17. The Charging Letter noted that the references to the IBEW Constitution were to an older version of the IBEW Constitution. "Also note that we do not have a copy of the Revised IBEW Constitution as yet, however, none of the Article have been altered in there [sic] intent and were only renumbered. We would appreciate it if you would correct them with the

proper Article number and sub section." Charging Letter at 2 (Ex. 9).

18. The Charging Letter noted that the "Independent Auditor's Report was of such of a sensitive nature no copies of the report were allowed to leave the Union Office, please obtain a copy from them to reference the expenditures." Charging Letter at 2.

19. On or about October 12, 1998, Dias sent Mowrey a letter with greater detail about the allegedly improper charges for which Waialeale was responsible (the "Dias letter"). Dias listed the dates, payees, and amounts of some expenditures that allegedly violated the IBEW Constitution, Local 1357 Bylaws, and other Local 1357 rules and policies. Dias also categorized those expenditures, stating that legal fees above retainer and lost wage reimbursements were the two types of expenditures made without Executive Board approval, and that the expenditures lacking proper documentation consisted of office supplies and Waialeale's travel expenses. Letter from Dias to Mowrey of Oct. 12, 1998 (Ex. 10).

### The Dixon Investigation and Mowrey's Finding

20. Mowrey assigned IBEW International Representative Timothy Dixon ("Dixon") to investigate the charges filed against Waialeale. Dixon Decl. (undated) ¶ 7 [hereinafter Dixon Decl.].

21. Mowrey sent a copy of the Charging Letter to Waialeale. In the cover letter, dated October 20, 1998, Mowrey informed Waialeale that Dixon was being assigned to investigate the charges and that, "[u]pon completion of [Dixon's] investigation," Waialeale would be "advised as to the outcome of these charges." Letter from Mowrey to Waialeale of 10/20/98 (Ex. 11).

22. Waialeale replied to Mowrey's letter in early November 1998. Mowrey Decl. ¶ 5.

23. On December 2, 1998, Dixon met with Waialeale in Hawaii and showed him the Miura report. Dixon testified that he showed Waialeale the vouchers and receipts associated with each expenditure itemized in the Miura report. Dixon reviewed the allegations against Waialeale and discussed each category of allegedly improper expenditures. Dixon Decl. ¶ 10. Waialeale, for reasons not communicated to the court, was not a witness at this trial, and neither he nor any other witness challenged Dixon's summary of what occurred.

24. Dixon told Waialeale that Waialeale could review the Miura report at the Local 1357 office during normal business hours. Dixon also told Waialeale that Waialeale could not obtain a copy of the Miura report and would not be permitted to photocopy the Miura report. Dixon Decl. ¶ 12; Teeple Hearing Tr. at 41 (Ex. 17). There is no evidence in the record indicating that Waialeale went to the Local 1357 office to review the Miura report, or that Waialeale ever attempted to view the report at the office after he received a copy of the Charging Letter referring to the report.

25. Although there was at least one unit meeting at which the Miura report was made available for review, there is no evidence that the Miura report was distributed or otherwise given to any member of the union at any time (except to the extent that Local 1357 representatives were given a copy to bring to unit meetings in August 1998). The Miura report was also shown to the Executive Board. Local 1357's refusal to provide Waialeale with a personal copy of the Miura report and Local 1357's prohibition on photocopying the report were consistent with the union's policy of keeping such reports confidential.

26. At the meeting on December 2, 1998, Dixon asked Waialeale if he had received a copy of the Dias letter. When Waialeale stated that he had not received a

copy, Dixon showed him a copy of the letter. It is unclear, however, whether Waialeale was given a personal copy of the Dias letter to keep. Dixon Decl. ¶ 11; Teeple Hearing Tr. at 39.

27. Waialeale gave Dixon a list of people to contact who might have information relevant to the investigation. Dixon interviewed everyone on the list with the exception of one person, who refused to be interviewed. Dixon Decl. ¶ 13.

28. Following his investigation, Dixon submitted a report to Mowrey dated February 22, 1999. Dixon found that three categories of the expenditures covered in the Miura report lacked both Executive Board approval and proper documentation: office supplies; negotiations and strike expenses; and business manager expenses. The report gave the amount of the violation in each category. There is no evidence that anyone gave Waialeale a copy of the report. Trial Test. of Dixon; Mem. from Dixon to Mowrey of 2/22/99 (Ex. 13).

29. Dixon did not conduct a hearing before submitting his investigation report to Mowrey in February 1999. Nor is there any evidence that Dixon considered earlier directives from the IBEW stating that a Business Manager did not need to obtain Executive Board approval for some kinds of expenses.

30. By letter dated March 16, 1999, Mowrey wrote to Waialeale with his findings. Mowrey's letter stated:

After an in depth investigation into charges brought against you regarding actions taken during your term of Office and upon review of all reports, statements, and other materials, I find the following.

You have been found guilty of violations of the following:

IBEW Constitution
  Article 17, Section 4
  Article 18, Section 4, 5, 7

  Article 25, Section 1(k)
Local 1357 Bylaws
  Article 10, Section 1, 4(b), 5
Local Union # 1357 Rules and Policies

All these violations are regarding expenditures made without proper documentation as follows:

| Office Equipment/Office Supplies | $48,672.75 |
|---|---|
| Negotiation/Strike Expenses | 17,231.24 |
| Business Manager's Expenses | 14,505.93 |
| Total | $80,499.92 |

Mowrey wrote that the total of $80,499.92 was "reimbursable to Local Union # 1357." Letter from Mowrey to Waialeale of Mar. 16, 1999 (Ex. 14).

31. Mowrey concluded the letter with the following paragraph: "Further, you are forbidden from holding a Local Union Office for five (5) years. Be advised that full restitution of the specified amount must be made immediately. If restitution is not made, expulsion from the I.B.E.W. will be imposed." Letter from Mowrey to Waialeale of Mar. 16, 1999 (Ex. 14).

32. By letter dated May 8, 1999, Waialeale wrote to Genovia asking to be mailed "three (3) sets of the following:

The current IBEW Constitution

The current Local Union 1357 By Laws

The current Local Union 1357 Rules and Policies."

Letter from Waialeale to Genovia of 5/8/99 (Ex. 29). There is no evidence that those documents were otherwise unavailable to Waialeale.

33. By letter dated May 13, 1999, Waialeale asked Mowrey for more specific charges in writing. Waialeale asked Mowrey to provide him with the "line items, transaction, dates, vendor, amount, etc." of the expenditures in question. Waialeale also requested "reasonable time to prepare my defense and be afforded a full and fair hearing on this matter." Letter from Waialeale to Mowrey of 5/13/99, at 3 (Ex. 15).

34. By letter dated May 17, 1999, Mowrey informed Waialeale that Waialeale had ten days from the date of the letter "to comply with the Local Union instructions to you." Mowrey warned, "Failure to schedule definite dates and times with the Local Union to review the account requiring backup information, within the 10 day period, will result in serious legal consequences." Letter from Mowrey to Waialeale of 5/17/99 (Ex. 16).

35. By letter dated May 26, 1999, Mowrey informed Waialeale that, as Waialeale had requested, a hearing would be held in Hawaii. It was scheduled for June 7 and 8, 1999. In the letter, Mowrey added, "I'm sure you realize that Accountants Reports are internal Local Union documents and as such can be reviewed in the office of the Local Union. They must not be copied." Letter from Mowrey to Waialeale of 5/26/99 (Ex. 107).

36. Genovia said that he sent three copies of the current IBEW Constitution and the Local 1357 Bylaws to Waialeale with a cover letter dated June 4, 1999. The letter noted that "[a] copy of the local union policies will be made available for your review at the Union Office." Trial Test. of Genovia; Letter from Genovia for Dias to Waialeale of 6/4/99 (Ex. 110). At the Teeple hearing, however, Waialeale claimed that he had not received those materials. At most, Waialeale failed to receive the documents over the weekend before the hearing; this does not mean Local 1357 failed to send them.

### The Teeple Hearing and Eads' Finding

37. On June 7 and 8, 1999, IBEW International Representative Gregory A. Teeple conducted a hearing in Hawaii. Teeple was chosen after Waialeale objected to the initial appointment of Dixon as a Hearings Officer. Waialeale was allowed to have assistance in presenting his case, to call witnesses, and to examine and cross-examine witnesses. Waialeale stated at the hearing that he had no witnesses to call and that he had not brought anyone to assist him. He gave no indication at the hearing that he was being prevented from calling witnesses or obtaining assistance. Teeple Hearing Tr. (Ex. 17). Lorraine Pa ("Pa") testified that Waialeale asked her to appear at the hearing on his behalf, but that someone from the IBEW told her in the hallway outside the hearing that she was not going to be called. Pa did not recall the name of the person who spoke to her. Trial Test. of Pa (10/9/02).

38. After the Teeple hearing, IBEW International President J.J. Barry ("Barry") asked International Vice President William C. Eads ("Eads") to review the evidence presented at the Teeple hearing and make a finding regarding the charges against Waialeale. Barry's request did not include any background or details about Waialeale's case, and Eads began his task without prior knowledge of the charges against Waialeale or of Mowrey's decision. Eads testified that, before reviewing the evidence from the Teeple hearing, he had formed no opinion as to Waialeale's guilt. Eads also testified that he received no materials other than what Barry sent to him and that he did not speak to any other IBEW or Local 1357 member regarding the charges before making his decision. Eads Decl. ¶¶ 2, 23–24.

39. Although Dixon had stated at the Teeple hearing that the purpose of the hearing was to determine whether the punishment imposed was appropriate and not whether Waialeale was guilty of the charges against him, Eads addressed the issue of Waialeale's guilt as well as the appropriateness of barring Waialeale from holding union office. Eads Decl. ¶ 3. Following his review of the evidence, Eads affirmed Mowrey's finding of guilt and the punishment imposed on Waialeale, and he informed Waialeale of his finding by letter

dated August 30, 1999. Eads Decl. ¶¶ 20–21; Letter from Eads to Waialeale of 8/30/99 (Ex. 18).

40. Following the denial of Waialeale's appeals to Barry and then to the IBEW International Executive Council, Waialeale's disqualification from holding office was announced in the May 2000 issue of the IBEW Journal. IBEW Journal (May 2000) (Ex. 120).

### The Election for Business Manager–Financial Secretary

41. In December 2000, members of Local 1357 nominated members for offices for the 2001 election. Both Dias and Waialeale were nominated for the position of Business Manager–Financial Secretary. No other candidates were nominated for that position, although, under the IBEW Constitution, Local 1357 members can nominate an unlimited number of members for election to any given office, including the office of Business Manager–Financial Secretary.

42. Dias was present at three unit meetings in which Waialeale was nominated for the position of Business Manager–Financial Secretary. Waialeale attended at least one of those meetings. Though Dias was aware that Waialeale was ineligible to run for office, Dias did not so inform the union members, most of whom may have been unaware of Waialeale's ineligibility. Dias gave credible testimony that he did not inform the membership of Waialeale's disqualification because, as a competitor with no role in deciding eligibility, he felt it was not his place to do so. Trial Test. of Dias (10/9/02).

43. No rule or policy was advanced requiring Dias, as Business Manager–Financial Secretary or as a union member, to inform the membership of Waialeale's disqualification, either in print or orally. There is no evidence that Dias remained silent about Waialeale's disqualification because of malice or as part of a plan to be reelected. On the contrary, as Dias testified, he was simply uncomfortable announcing that a potential opponent was ineligible to hold office, especially as that potential opponent was present.

44. On December 28, 2000, after the nomination period for the February 2001 election had closed, Dixon telephoned Karenann Wedge–Lewis and told her that IBEW had deemed Waialeale ineligible to run for office. Dixon Decl. ¶ 30. As Local 1357's Election Judge for the February 2001 election, Wedge–Lewis was responsible for conducting the election, including the preparation of the ballots. Local 1357 Bylaws article 3, section 4 (Ex. 2); Wedge–Lewis Decl. ¶ 1.

45. Dias ran unopposed and won the election for Business Manager–Financial Secretary.

### Waialeale's Title I Suit and Settlement

46. On the eve of the February 2001 election, Waialeale filed suit against Local 1357 and the IBEW under Title I of the LMRDA, contending that he had been disciplined and disqualified from the February 2001 election in violation of 29 U.S.C. § 411(a)(5). On April 26, 2001, this court dismissed Waialeale's claims with prejudice after Waialeale, Local 1357, and the IBEW agreed to settle the case. *See* Stipulation for Dismissal with Prejudice as to All Claims and Parties and Order in *Waialeale v. Int'l Bhd. of Elec. Workers*, CV 01–00064 SOM/BMK (Apr. 6, 2001). Under the settlement agreement, Waialeale agreed not to run for office until after January 1, 2008. In exchange, Local 1357 and the IBEW waived their claim for restitution of the allegedly misappropriated funds.

### Filing of Complaint with the Secretary

47. Following the election, Joseph Kim, a member in good standing of Local 1357, filed a complaint with the Department of

Labor, demanding a new election. *See Chao v. Local 1357,* 184 F.Supp.2d 1029, 1033 (D.Haw.2001) (Order Denying Defendant's Motion to Dismiss). Kim had apparently been planning to vote for Waialeale and was unaware that Waialeale had agreed not to seek office.

48. After investigating Kim's complaint, the Department of Labor determined that Local 1357 had violated Title IV of the LMRDA by disqualifying a member in good standing as a candidate for office on the basis of union discipline imposed in violation of Title I of the LMRDA. The Secretary filed this suit to have the February 2001 election for Business Manager–Financial Secretary declared null and void and to require a new election under the Secretary's supervision. *See id.*

## III. *CONCLUSIONS OF LAW.*

1. Title IV of the LMRDA states, in relevant part, that "a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office ... and shall have the right to vote for or otherwise support the candidate or candidates of his choice...." 29 U.S.C. § 481(e).

2. If, by a preponderance of the evidence, the court finds that "a violation of § 481 of this title may have affected the outcome of an election," then the court "shall declare the election ... to be void and direct the conduct of a new election under supervision of the Secretary." 29 U.S.C. § 482(c).

3. A § 481 violation establishes a prima facie case that the violation may have affected the outcome of the election. *Reich v. Dist. Lodge 720,* 11 F.3d 1496, 1499 (9th Cir.1993). The union may rebut the presumption by "introducing tangible evidence 'which supports a finding that the violation did not affect the result.'" *Don-*

*ovan v. Local Union 70,* 661 F.2d 1199, 1202 (9th Cir.1981) (quoting *Wirtz v. Hotel, Motel & Club Employees Union, Local 6,* 391 U.S. 492, 507, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968)).

4. The purpose of Title IV of the LMRDA is "to provide free and democratic elections while giving effect to the countervailing policy that unions should be free to conduct their affairs so far as possible and the government should not become excessively involved in union politics." *Chao v. Bremerton Metal Trades Council,* 294 F.3d 1114, 1119–20 (9th Cir.2002).

5. While Title IV protects the election process, Title I provides certain procedural safeguards to individual union members. Under Title I, "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C. § 411(a)(5).

6. Title I of the LMRDA requires that charges against a union member must be "specific enough to inform the accused member of the offense that he has allegedly committed." *Int'l Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 616, 28 L.Ed.2d 10 (1971). A "highly technical statement of the facts" is not required. *Johnson v. Nat'l Ass'n of Letter Carriers Branch 1100,* 182 F.3d 1071, 1074 (9th Cir.1999). "Instead, an informal written statement of facts suffices. The level of detail required is that needed to notify the accused of the incidents that form the basis of the charge so that he or she may prepare a defense." *Id.* at 1074–75 (internal citations omitted). "[T]he charge does not need to allege facts sufficient to support the charge or the particular elements of the charge. Instead, the goal is to give

the accused member notice of the conduct that he ... is expected to defend." *Id.* at 1074 n. 5.

7. The Secretary alleges that Waialeale's Title I rights were violated by the issuance of charges that, in their written form, were not sufficiently specific. The Secretary further alleges that the Title I violations caused the election in February 2001, in which Waialeale was not allowed to run, to violate Title IV.

8. Even if the Charging Letter is considered the only written charge, that does not mean that Title I was violated, or that Title IV was violated.

■ 9. The Ninth Circuit has held that charges must include "a statement of the facts describing the incident on which the charge is based." *Johnson,* 182 F.3d at 1074. How detailed the factual statement must be depends on the circumstances. While the court concedes that this case presents a close call as to whether the Charging Letter, standing alone, was sufficiently specific to satisfy the requirements of § 411(a)(5)(A) under *Johnson,* the court concludes that it was. The Charging Letter specified the ways in which Waialeale had allegedly failed to follow IBEW and Local 1357 rules and policies, as well as the time period during which the conduct in question occurred. The Charging Letter made it clear that Waialeale was accused of having failed to document various expenditures, and that those expenditures were made between 1996 and 1998. The expenditures and time period could certainly have been more detailed, which would have been preferable, but the law does not require the best possible articulation of charges. The Charging Letter did specifically complain about the use of Local 1357's funds for golf games, books purchased as gifts, and flowers. The Charging Letter also made it clear that the details of the specific transactions at issue were listed in a report that was available at the Local 1357 office for review.

■ 10. Even if the Charging Letter as a stand-alone document would be insufficient, it is sufficient because it incorporates the Miura report. Clearly, with the Miura report, Waialeale was "notif[ied] ... of the incidents that form[ed] the basis of the charge so that he [could] prepare a defense." *Johnson,* 182 F.3d at 1075. The letter specifically mentions the Miura report as the basis for the charges, invites review of the Miura report at Local 1357's office, and offers a legitimate reason for the report's unavailability. The office at which the report was available was where Waialeale had worked for nine years. The Secretary did not call Waialeale as a witness, did not offer any explanation for failing to do so, and did not offer any evidence that Waialeale was prevented from reviewing the Miura report. Instead, the Secretary argues that the Charging Letter must be viewed as standing alone and as defective on its face. As noted above, this court concludes that, standing alone, the Charging Letter is sufficient. However, the circumstances of this case make it clear that the Charging Letter incorporated and referred to the Miura report. It was followed by the Dias letter, which Dixon shared with Waialeale in December 1999, and by a detailed review of records by Dixon and Waialeale when they met in December 1999.

■ 11. Furthermore, even if the Charging Letter was insufficiently specific despite its clear and unambiguous references to the Miura report, the Secretary would have to show prejudice to Waialeale in order to prevail in a Title IV case in which the disciplined union member could not be a candidate in any new election ordered by this court.

12. The Ninth Circuit has not expressly held that a disciplined union member in

a Title I suit must, in addition to demonstrating that the charges against him lacked specificity, also show that he was "misled or otherwise prejudiced in the presentation of his defense." *Johnson,* 182 F.3d at 1076 n. 9. The Ninth Circuit has only held that, to the extent a showing of prejudice is required, the total absence of factual detail renders a charge inherently prejudicial. Thus, in *Johnson,* charges that contained sweeping accusations of misrepresentations were deemed inherently prejudicial.

13. As this is not a Title I case, the issue of whether a disciplined union member must show prejudice to himself to prevail in a suit challenging the discipline is not before this court. *See, e.g., Newell v. Int'l Bhd. of Elec. Workers,* 789 F.2d 1186, 1190 (5th Cir.1986) (holding that, in addition to a technical violation of § 101(a)(5)(C), a showing of prejudice was required for the court to hold that disciplined members had been deprived of any substantive rights under the LMRDA); *Frye v. United Steelworkers of Am.,* 767 F.2d 1216, 1223 (7th Cir.1985) (holding that, "to establish a violation of 101(a)(5)(A), a disciplined member must demonstrate that he was misled or otherwise prejudiced in the presentation of his defense"). Nor is this court called upon to determine whether Waialeale had valid Title I claims against Local 1357. As the court noted above, one could certainly improve on the Charging Letter and the handling of the investigation. But even if an individual union member in a Title I suit could restrict consideration to the four corners of the written charges and was not required to show prejudice, the Secretary in the present context is required to make some showing of prejudice to prevail.

14. Where no showing of prejudice to Waialeale has been made, a new election makes no sense. Waialeale is barred from running in a new election supervised by the Secretary by the terms of his settlement with Local 1357. Even if a Title I violation occurred in the IBEW's discipline of Waialeale, a new election in which Waialeale could not run would not remedy any prejudice that might be claimed by Local 1357 members who might otherwise have voted for Waialeale. There is no evidence that other nominations would have occurred but for the alleged Title I violation. The alleged Title I procedural violation is the only basis advanced by the Secretary for finding a Title IV violation that justifies a new election. The Secretary does not show, for example, that Dias or any other member of the IBEW or Local 1357 conspired to deprive Local 1357 members of their Title IV right to elect a Business Manager–Financial Secretary by ensuring that Dias would be the only candidate. Even if a technical violation of Waialeale's procedural rights under Title I occurred, the Title IV remedy of a new election would not address Waialeale's resulting disqualification or any deprivation of the rights of union members who would have voted for Waialeale in the 2001 election.

15. In the absence of a showing of prejudice to Waialeale (i.e., any evidence that Waialeale would not have been found guilty of failing to obtain Executive Board approval and provide proper documentation had the IBEW's process been different), this court cannot conclude that Title IV was violated based on an alleged Title I violation. The Ninth Circuit's formulation of the specificity test under § 411(a)(5)(A) focuses on ensuring that the accused union member is able to defend himself against the charges. *Johnson,* 182 F.3d at 1074 n. 5, 1075. The Secretary has not offered any evidence to show that Waialeale was misled in his defense because the Charging Letter did not include more detail of the transactions that violated union rules.

16. The Secretary, who has the burden of proof, has not demonstrated that Waialeale was "misled or otherwise prejudiced in the presentation of his defense." *See Hardeman,* 91 S.Ct. at 616–17; *Johnson,* 182 F.3d at 1076. The Secretary did not offer any evidence showing that Waialeale had performed his duties in accordance with all governing documents. The Secretary did not offer any evidence as to how Waialeale's defense would have been different or how Mowrey's finding of guilt (based on Dixon's investigation) or Eads' finding of guilt (based on the Teeple hearing) would have been different had the Charging Letter been more specific or had the hearing been conducted at a different time or in a different manner. The court recognizes that the investigation's procedures could have been made clearer to Waialeale, and that the hearing schedule was not optimal for Waialeale. Again, however, this court is not in the business of requiring the best of all possible union procedures. The court looks only at compliance with applicable law.

17. The Secretary, relying on *Johnson,* has argued that the charges in the present case were inherently prejudicial because they lacked any factual detail, and that, therefore, no additional showing of prejudice to Waialeale is required. The charges in *Johnson,* however, contained only abstract allegations without mentioning the time of events or manner in which the accused had, for instance, acted without the authority of the union's Executive Council. The charging parties in *Johnson* cited no specific examples of conduct. *Johnson,* 182 F.3d at 1075 (noting that "[t]he charges mention abstract allegations, but fail to cite any specific examples"). In contrast, the Charging Letter in Waialeale's case made specific factual allegations about the time period during which the challenged transactions took place, the specific ways in which Waialeale violated Local 1357's governing rules and policies, and the types of expenditures the charging members found questionable. The charging parties also made it clear that the findings in the Miura report were the basis for the charges and that the Miura report, which had not been distributed due to its sensitive nature, was available for review at Local 1357's office. Because the Charging Letter contained substantial factual detail, *Johnson* does not require that this court conclude that the charges against Waialeale were inherently prejudicial.

18. Nor is there any evidence that nominations for the February 2001 election were somehow wrongfully restricted just because Waialeale was ineligible. Under these circumstances, this court cannot conclude that ordering a new election would remedy any alleged procedural shortfall by the IBEW as to the specificity of charges in Waialeale's case.

19. To hold that any technical violation of § 411(a)(5) requires a new election would be to say that the Secretary could order a new election that included as a candidate a union member who voluntarily admitted, say, bribery or embezzlement, but who had failed to receive specific charges of those offenses in writing. Clearly, in the criminal context, law enforcement and prosecutors are held to an exacting standard, but the Secretary does not establish that Congress intended to require new elections when lay union members fail, to no one's prejudice, to draft sufficiently specific charges. The Title IV remedy of a new election is not, after all, aimed at deterring or punishing laypersons for inartful or defective drafting. A new election is instead aimed at ensuring a fair and open election. Therefore, even assuming the written charges against Waialeale were defective, the court could not conclude that, in the absence of

prejudice, the February 2001 election failed to be fair and open.

■ 20. For similar reasons, a new election is not required just because the Teeple hearing occurred after Waialeale was found guilty. In a direct suit by disciplined union members under Title I, the Fifth Circuit has held that failure to hold a hearing prior to the imposition of discipline does not deprive the disciplined members of any substantive rights under the LMRDA. *See Newell v. Int'l Bhd. of Elec. Workers*, 789 F.2d 1186, 1190 (5th Cir. 1986). This court does not express any opinion as to whether the Ninth Circuit similarly requires a showing of prejudice under § 411(a)(5)(C) (requiring a full and fair hearing) in a suit brought by a disciplined union member. In this Title IV case, however, where the Secretary sues the union to vindicate the voting rights of allegedly disenfranchised Local 1357 voters, rather than the due process rights of Waialeale, a technical violation by the IBEW in failing to hold a hearing prior to Mowrey's finding of guilt does not constitute a Title IV violation in the absence of a showing of actual prejudice to Waialeale or other union members.

21. The required showing of actual prejudice to Waialeale or other union members has not been made. The Secretary has failed to show how the Teeple hearing or the outcome of the hearing would have been different had it occurred before the IBEW found Waialeale guilty. Waialeale was permitted to call witnesses, which he chose not to do, offer other types of evidence, and conduct cross-examination. The Secretary has not alleged or proven that Waialeale's defense would have been any different had the hearing been held before the initial finding of guilt. Nor has the Secretary alleged or proven that Waialeale's defense was prejudiced by Dixon's statement at the Teeple hearing that the purpose of the hearing was to determine whether the punishment imposed was appropriate and not whether Waialeale was guilty of the charges against him.

22. In summary, the court concludes that the Secretary has not satisfied her burden of establishing that this court should order a new election because: (1) the Charging Letter, standing alone, was sufficiently specific to provide the accused member with notice of the charges; (2) even if the Charging Letter, standing alone, was defective, it must be read as having incorporated the Miura report and thereby providing great specificity; (3) even if the Charging Letter was insufficient despite its incorporation of the Miura report, or even if the procedure followed by the Secretary constituted some other technical violation of 29 U.S.C. § 411(a)(5), the Secretary, to prevail in this case, must, but does not, show prejudice; and (4) a new election would not address any procedural defect alleged by the Secretary, as Waialeale cannot run in any new election. Under these circumstances, the Secretary does not prevail.

## IV. ORDER.

Based on the above findings of fact and conclusions of law, the court holds that the Secretary has not shown that there has been a Title IV violation and that a new election should be ordered. The clerk of the court is directed to enter judgment in favor of Local 1357.

The court denies both Local 1357's pending motion for judgment as a matter of law and Local 1357's motion for reconsideration of this court's ruling admitting evidence of the state of mind of the members who signed the Charging Letter. Any ruling on those motions is superfluous

in light of the present ruling in favor of Local 1357.

IT IS SO ORDERED.